H7016dt (8/20)

Filer's Name, Address, Phone, email & Signature:

CASE LOMBARDI & PETTIT, A LAW CORPORATION
TED N. PETTIT (4287); MARK G. VALENCIA (6783); MICHELLE J. CHAPMAN
(9351); MARIA AMPARO V. MCCORMICK (10623)
737 Bishop Street, Suite 2600 Mauka Tower
Honolulu, Hawaii 96813; Phone: (808) 547-5400 | Fax: (808) 523-1888
Attorneys for Defendant Tianjin Dinghui Hongjun Equity Investment Partnership



**Filed by: /s/** MARIA AMPARO V. MCCORMICK

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF HAWAII

| Debtor(s):<br>Pacific Links U.S. Holdings, Inc., et al. | Case No.:<br><br>**21-00094** |
|---|---|
| Plaintiff(s)/Movant(s):<br>Pacific Links U.S. Holdings, Inc., et al.<br><br>*(Use "et al." for multiple parties)* | Adversary Proceeding No.:<br><br>**21-90009** |
| Defendant(s)/Respondent(s):<br>Tianjin Dinghui Hongjun Equity Investment Partnership<br><br>*(Use "et al." for multiple parties)* | Trial/Hearing Date:<br><br>**June 27, 2022** |

### WRITTEN TESTIMONY FOR TRIAL / EVIDENTIARY HEARING
☒ DIRECT TESTIMONY ☐ REBUTTAL TESTIMONY

*Attach declarations of each witness - use continuation sheet if needed.*

| Declaration<br>No. | Declarant |
|---|---|
| 1 | Xiadong Yang |
| 2 | Garret Hoe |
| 3 | Du Sha (hostile and unavailable witness) |
| 4 | Logan Weber (hostile and unavailable witness) |
| | |
| | |
| | |

| | Continuation Sheet # _____ |
|---|---|
| *Declaration No.* | **Declarant** |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                        4287
Email: tnp@caselombardi.com
MARK G. VALENCIA                     6783
Email: mgv@caselombardi.com
MICHELLE J. CHAPMAN                  9351
Email: mjc@caselombardi.com
MARIA AMPARO V. MCCORMICK    10623
Email: mav@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Phone: (808) 547-5400 | Fax:  (808) 523-1888

Attorneys for Defendant
Tianjin Dinghui Hongjun Equity Investment Partnership

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 21-00094 |
| | (Chapter 11) |
| PACIFIC LINKS U.S. HOLDINGS, INC., a Delaware Corporation, | (Jointly Administered) |
| Plaintiff and Plaintiff in Possession. | |
| This Adversary Proceeding relates to: | |
| ALL CASES | |
| PACIFIC LINKS US HOLDINGS, INC., et al., | Adversary Proceeding No. 21-90009 |
| Plaintiffs, | Trial: June 27, 2022 |
| vs. | |

TIANJIN DINGHUI HONGJUN
EQUITY INVESTMENT
PARTNERSHIP (LIMITED
PARTNERSHIP),

          Defendant.

## <u>WRITTEN DIRECT TESTIMONY OF XIAODONG YANG</u>

I, XIAODONG YANG, hereby declare, that I am over the age of 18 years old, I am competent to make this declaration, I make this declaration upon my personal knowledge or from my review of Defendant Tianjin Dinghui Hongjun Equity Investment Partnership's (**"TDH"**) business records and other documents kept in the ordinary course of TDH's business, except as otherwise stated. I have some ability to read and speak English and have had the assistance of Counsel that speaks Chinese in communicating my personal knowledge herein.

1.     I am an alternative investment fund manager of CDH Investment Management (Tianjin) Co., Ltd. (**"CDH Tianjin"**), which is the managing partner of TDH.

2.     CDH Taijin is an affiliate of CDH Investments, one of the leading alternative investment fund managers in China with over $26.6 Billion of assets under management, as of September 2021.

3.     TDH has loaned funds to Tianjin Kapolei Business Information Consultancy Co., Ltd. (**"TKB"**) for a number of years.

2

4.    From TDH's years of experience and business relationships with TKB and its affiliated entities, including disclosures and representations made to TDH by TKB and its affiliated entities, TDH understands the following:

     a.    TKB is part of a global network of companies known as Pacific Links, which network is ultimately owned by Du Sha.

     b.    Pacific Links is in the business of acquiring, owning, developing, selling, and promoting membership interests in a global network of golf courses, including Plaintiffs' development and operation of golf courses on Plaintiffs' Makaha Property.

     c.    TKB is the entity tasked with advertising and selling golf memberships in China for the Pacific Links global network of golf courses, including Plaintiffs' Makaha golf course.

     d.    Plaintiffs are a subset of Pacific Links North American entities that hold title to, operate, and manage the Makaha Property.

5.    I am familiar with the loan transactions between TDH, as lender, and TKB, as Borrower and other related parties, including Plaintiffs.

6.    In 2017, TDH loaned RMB 240 million to TKB as memorialized in that certain Entrusted Loan with China CITIC Bank as agent and TDH as Trustor (**"2017 Loan"**).

3

7.     Attached hereto as **Exhibit D-1** is a true and correct copy of the 2017 Loan in Chinese.

8.     On April 24, 2018, TDH loaned RMB 160 million to TKB and agreed to extend the 2017 Loan, as memorialized in that certain Convertible Debt Agreement for Phase I Project ("**2018 Loan**").

9.     Attached hereto as **Exhibit D-2** is a true and correct copy of the 2018 Loan in Chinese.

10.     In 2019, Pacific Links owner, Du Sha, contacted Wu Shangzhi of TDH, requesting an extension of the 2017 Loan and 2018 Loan, explaining that Pacific Links was short of cash and thus unable to pay back the 2017 and 2018 Loan on time.

11.     TDH assigned a 3-person team consisting of Yao Yuan, Chen Zhuoyi and myself to investigate Pacific Links' financial situation and use of the 2017 Loan and 2018 Loan proceeds.

12.     Vivien Zhang and Sunny Xing were Pacific Links' main contact that communicated with the TDH team.

13.     During TDH's investigation, in August and September 2019, Sunny Xing (Pacific Links) informed Chen Zhuoyi (TDH) that between 2017 and the first half of 2019, roughly RMB 130 million of the 2017 Loan and 2018 Loan funds were transferred outside of China to support Pacific Links' North American

4

entities, the majority of which ($20,850,000) was used to pay other loans and development expenses for the Makaha Property.

14.     According to Sunny Xing (Pacific Links), Pacific Links used conduit entities (for example, the operator of 27 Club in Tianjin) to transfer money from China to North America in order to avoid China foreign exchange regulations.

15.     Attached hereto as **Exhibit D-3** is a true and correct copy of Sunny Xing's (Pacific Links) WeChat (an instant messaging software) communication with Chen Zhuoyi (TDH) in Chinese, an English translation of which is attached as **Exhibit D-3A**.

16.     Attached hereto as **Exhibit D-4** is a true and correct copy of the summary of the use of funds by Pacific Links' North America entities sent by Sunny Xing (Pacific Links) to Chen Zhuoyi (TDH) in Chinese, and English translation of which is attached **Exhibit D-4A.**

17.     In 2019, Pacific Links provided due diligence materials to TDH, including information regarding Plaintiffs' ultimate beneficiary/owner (*i.e.*, Du Sha), organizational structure, business model, balance sheets, and development plans and spending forecast for the Makaha Property.

18.     Attached hereto as **Exhibit D-5** is a true and correct copy of one of the tables of an Excel Spreadsheet with the name "Makaha Resort Balance Sheet

5

12.31.2019." Pacific Links sent the native Excel Spreadsheet to TDH in connection with due diligence for the 2019 Loan (defined *infra*).

19. The financial statements that Pacific Links provided to TDH (Exhibit D-5) showed that Plaintiffs' assets exceeded their liabilities, and, while TKB was expected to pay the debt in full, should Plaintiffs and the other guarantors be called on to pay amounts due in the event of TKB's default, Plaintiffs' assets were more than sufficient to cover their share.

20. Attached hereto as **Exhibit D-6** is a true and correct copy of one of the tables of an Excel Spreadsheet Pacific Links provided to TDH showing TKB's financial overview in Chinese, an English translation of which is attached as **Exhibit D-6A**.

21. The financial statements that Pacific Links provided to TDH (Exhibit D-6) showed that TKB's sale proceeds and profits in 2020, 2021, and 2022 would be substantial, and thus, there would be more than sufficient funds to repay the 2019 Loan (defined *infra*).

22. In 2019, Du Sha also represented to TDH that Pacific Links China, including TKB, was very successful and that sales revenues were expected to increase year after year.

6

23.    Based on Du Sha's representations, TDH had great confidence in the future of Pacific Links' business and its ability to repay the 2019 Loan (defined *infra*).

24.    Plaintiffs' agreement to provide the Makaha Property as additional security is the key reason that induced TDH to enter into a new transaction in 2019.

25.    On December 11, 2019, TDH agreed to retire the 2017 Loan in exchange for a new loan with new convertible loan terms, and extended the deadlines under the 2018 Loan (**"2019 Loan"**).

26.    As of December 11, 2019, the amount of the RMB 400 million debt converted to United States Dollars was $56,812,800.

27.    TDH entered into the 2019 Loan with the understanding that Plaintiffs had benefitted from TDH's prior loans and would benefit from TDH's agreement to enter into the new transaction that was being requested by Du Sha to facilitate Pacific Links' immediate cash flow needs.

28.    TDH understood that the 2019 Loan would free up funds for Plaintiffs' continued operations and development of the Makaha Property.

29.    The 2019 Loan is memorialized in the following transaction documents, each dated December 11, 2019, executed by TDH, TKB, Plaintiffs and other Pacific Links entities:

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 9 of 77

     a.      Framework Agreement

     b.      Convertible Debt Agreement

     c.      Secured Guaranty

     d.      MVCC Mortgage

     e.      MGCW Mortgage

     f.      MDRE Mortgage

     g.      MDRE 2 Mortgage

     h.      MDRE 3 Mortgage

     i.      MDRE 4 Mortgage

     j.      MDRE 5 Mortgage

     k.      PLUSH Pledge Agreement

     l.      Related transaction documents.

30.    Attached hereto as **Exhibit D-7** is a true and correct copy of the Framework Agreement in Chinese.

31.    Attached hereto as **Exhibit D-8** is a true and correct copy of the Convertible Debt Agreement in Chinese.

32.    Under the Framework Agreement:

     a.      TKB is the Borrower and the primary obligor.

     b.      The following individuals and entities are Pledgors and obligors:

              Pacific Links (Asia) Holding Co., Limited (PLAH), Zhao

8

Xueming, Pacific Links Golf Development Co., Limited (PLGDL), Sun Ling, Jiao Ruojun, Du Sha, PLUSH, Pacific Links International Company (PLIC), and Beijing Global Sports Leisure Club Co., Ltd. (Beijing Global).

c.   Du Sha and Du Ran are obligors and jointly and severally liable as co-guarantors of the debt.

d.   Plaintiffs MVCC, MGCW, MDRE, MDRE 2, MDRE 3, MDRE 4 and MDRE 5 are Mortgagors and obligors.

e.   There are in total 19 obligors.

33.   Under the Secured Guaranty, Pacific Links International Company (PLIC) and Plaintiffs are jointly and severally liable as co-guarantors of TKB's debt under the 2019 Loan.

34.   The 19 obligors under the Framework Agreement, own valuable assets, including the Makaha Property and five golf courses in China.

35.   Pacific Links China obligors own the following five golf courses: Tianijn 27 Club, Beijing Jingshan Lake, Beijing Orient Double Eagle, Beijing Riverside Resort, and Beijing Tia'an Resort, respectively. These golf courses are located prominently in Beijing and Tianjin, two of China's largest and most expensive cities.

9

36.     Du Sha represented that the total price Pacific Links paid to acquire the five Chinese golf courses exceeded RMB 1.5 billion (approximately 220 million United States Dollars).

37.     The foregoing five golf courses in China would be available for any contribution claim Plaintiffs may have against the other co-obligors if they pay TDH more than their share.

38.     TDH disbursed the 2019 Loan funds into TKB's bank account ending with 0104 (the "**0104 Account**") on the following dates in the following amounts:

      a.  December 13, 2019 (RMB 30 million);

      b.  December 16, 2019 (RMB 30 million);

      c.  December 17, 2019 (RMB 150 million);

      d.  December 18, 2019 (RMB 29 million); and

      e.  December 19, 2019 (RMB 1 million).

39.     Attached hereto as **Exhibit D-9** are true and correct copies of bank slips showing the disbursement of funds in Chinese, and English translation of which is attached hereto as **Exhibit D-9A**.

40.     I have reviewed TKB's 2019 bank statements for 0104 Account ("**TKB's Bank Statements**"), produced by Plaintiffs (DEBTORS 012355-DEBTORS 012604).  Attached hereto as **Exhibit D-10** are annotated excerpts of

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 12 of 77

TKB's Bank Statements for the period from December 13, 2019 to December 27, 2019.

41.    In particular, TKB's Bank Statements show that from December 13 to December 19, 2019, TDH made seven (7) bank transfers to TKB's 0104 Account in the amounts of RMB 30 million, 30 million, 50 million, 50 million, 50 million, 29 million, and 1 million, respectively.

42.    TKB's Bank Statements also show that from December 16 to December 18, 2019, TKB made six (6) transfers out of the 0104 Account into another Pacific Links account in the amounts of RMB 30 million, 50 million, 50 million, 50 million, 30 million, and 35 million.

43.    The Secured Guaranty, Mortgages, and PLUSH Pledge Agreement were an essential inducement of, precondition to, and valuable consideration for TDH's agreeing to the 2019 Loan.

44.    In the Secured Guaranty and PLUSH Pledge Agreement, Plaintiffs expressly represented to TDH that Plaintiffs "will receive substantial direct and indirect benefits from the [2019 Loan]" which representation was supported by the disclosed Pacific Links business model.

45.    In agreeing to enter the 2019 Loan, TDH relied in good faith on the representations made by Plaintiffs, TKB and Du Sha, which were supported by the

fact that Pacific Links used TDH prior loan funds in large part to pay Plaintiffs' other loans and development expenses for the Makaha Property.

46.    As of December 11, 2019, none of the parties anticipated or appreciated the impact that the COVID-19 pandemic would have on golf courses, Pacific Links' business model and the world, and the same was not factored into the value exchanged as of December 11, 2019.

47.    Due to TKB's failure to make payment to TDH on January 20, 2020, as required under the terms of the Framework Agreement, TDH sent a notification letter to TKB on February 24, 2020, acknowledging the COVID-19 impacts in TKB's operating cash flow and agreeing to extend the deadline for the first payment to March 20, 2020.

48.    Attached hereto as **<u>Exhibit D-11</u>** is a true and correct copy of the February 24, 2020 notification letter in Chinese.

49.    On March 7, 2020, Du Sha, sent a letter via WeChat to Wu Shangzhi stating among other things:

> In order to solve the current crisis and to do our best to pay TDH's loan at the end of this year, I have asked CBRE, the US' largest real estate sales agent company to sell the Hawaii land properties. We will sell it even if it means taking a loss … We will stick to the same principle, i.e. liquidating them as soon as possible even if we suffer losses during the process.  This is a determined strategy.

12

50.    Attached hereto as **Exhibit D-12** is a true and correct copy of the March 7, 2020 letter in Chinese, an English translation of which is attached hereto as **Exhibit D-12A**.

51.    Consistent with the statements made by Du Sha on his March 7, 2020 letter, Du Sha sent a Makaha Valley Marketing Update ("**Marketing Update**") dated March 23, 2020 to TDH. The Marketing Update shows that the initial marketing Eblast for the Makaha Property occurred on February 4, 2020.

52.    Attached hereto as **Exhibit D-13** is a true and correct copy of the Makaha Valley Marketing Update dated March 23, 2020 and prepared by Jeff Woolson of CBRE.

53.    On March 29, 2020, Du Sha sent a WeChat message to Yao Yuan, representative of TDH, stating among other things:

> One month ago, I contacted Mr. Wu and wanted to fly to Hong Kong to meet him. He declined saying that he needs to discuss with your team and then agree on a time for a meeting. As of now, I have not received his further information. Our interest are aligned. I have never in my life a record of failing to pay back debts. So I wanted to discuss with Mr. Wu to find a perfect solution. I don't want to leave CDH in a difficult situation but want to find a way with you to pull through the Covid-19 crisis. Therefore, I wish we can stand together to overcome the difficulties. In fact, there is only one way out, which is to sell the golf courses and the Hawaii land properties. This would pay back the loans and also increase our working capital and thus rebuild trust in the market.
>
> In conclusion, if we can sell the golf courses and thus pay back your loans, the company still has a bright prospect.

13

54.     Attached hereto as **Exhibit D-14** is a true and correct copy of the March 29, 2020 WeChat message in Chinese, and English translation of which is attached as **Exhibit D-14A.**

55.     Due to TKB's failure to make payments to TDH on March 20, 2020 and comply with other non-monetary terms under the Framework Agreement, including failure to timely register and/or perfect security agreements provided therein, TDH sent another notification letter to TKB on April 2, 2020, demanding immediate payments.

56.     Attached hereto as **Exhibit D-15** is a true and correct copy of the April 2, 2020 notification letter in Chinese.

57.     Plaintiffs were not called on to pay any amount in connection with the 2019 Loan until November 2020.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED: Beijing, China, June 13, 2022.

Xiaodong Yang

15

CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                          4287
Email: tnp@caselombardi.com
MICHELLE J. CHAPMAN              9351
Email: mjc@caselombardi.com
MARIA AMPARO V. MCCORMICK       10623
Email: mav@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Phone: (808) 547-5400 | Fax:  (808) 523-1888

Attorneys for Defendant
Tianjin Dinghui Hongjun Equity Investment Partnership

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PACIFIC LINKS U.S. HOLDINGS, INC., a Delaware Corporation,<br><br>    Plaintiff and<br>    Plaintiff in Possession. | Case No. 21-00094<br>(Chapter 11)<br>(Jointly Administered) |
| This Adversary Proceeding relates to:<br><br>ALL CASES<br><br>PACIFIC LINKS US HOLDINGS, INC.; HAWAII MVCC LLC; HAWAII MGCW LLC; MDRE LLC; MDRE 2 LLC; MDRE 3 LLC; MDRE 4 LLC; and MDRE 5 LLC,<br><br>    Plaintiffs, | <br><br><br>Adversary Proceeding No. 21-90009<br><br><br><br>Trial Date: June 27, 2022 |

vs.

TIANJIN DINGHUI HONGJUN
EQUITY INVESTMENT
PARTNERSHIP (LIMITED
PARTNERSHIP),

       Defendant.

## <u>WRITTEN DIRECT TESTIMONY OF GARRET HOE</u>

I, GARRET HOE, under penalty of perjury, declare that the following is true and correct:

1.     I have knowledge of the matters set forth in this declaration and , if called upon to testify, I could and would competently testify thereto.  I am over 18 years of age.

2.     I am licensed by the State of Hawaii as a Certified Public Accountant, and have been since ___June_____, __2014 ____.

3.     Currently I am a principal of Garret J. Hoe, CPA.

4.     Prior to joining this firm. I worked in various capacities including as director of operations, and business manager, for several telecommunications and transportation companies.

5.     I have 20 years of litigation support experience.

6.     I am a member of the American Institute of Certified Public Accountants and the Hawaii Society of Certified Public Accountants.

7.     My true and accurate curriculum vitae is attached to my Expert Opinion dated May 2, 2022 which is Exhibit D-72.

8.     At Garret J. Hoe, CPA, I provide litigation support analyzing complex financial data to opine upon, *inter alia,* allegations of fraud, business valuation, damage analyses, forensic accounting, solvency analyses and other consulting services.

## SCOPE OF WORK & SUMMARY OF OPINIONS

9.     I was asked to opine upon the benefits and value that Plaintiffs PLUSH MVCC, MGCW, MDRE, MDRE 2, MDRE 3, MDRE 4, and MDRE 5 (collectively "Plaintiffs") received from the 2019 Loan.[1]

10.     Based on my review of the information and documents listed on Attachment A-1 to my Report, Plaintiffs received benefits and value from the 2019 Loan because it enabled the Pacific Links entities to retain the funds necessary to:

      a.  Continue work on the Makaha development (real property and golf membership sales);

      b.  Pay operating expenses for the golf course and club operations;

      c.  Pay down other loans and/or mortgages; and

      d.  Extend the time available to successfully complete the Makaha

---

[1] For consistency, capitalized terms that are not otherwise defined herein have the definitions and/or meanings set forth in the parties' Joint Statement of Glossary of Terms and Acronyms for Trial.

development.

11.    In total, the value of the foregoing benefits of the 2019 Loan to Plaintiffs was $80.7 million, broken down as follows:

| Item | Potential and Realized Value |
|---|---|
| Membership/Lot Tiers and Unit Price | $36,862,636 |
| President's Membership Sales | 36,803,571 |
| Paid in Capital – 2020 | 7,063,037 |
| **Total Potential or Realized Value** | **$80,729,244** |

12.    In addition, Plaintiffs received value from December 2019 forward including:

   a.  $800,000 in transfers from Pacific Links Golf Limited to Pacific Links U.S. Services;

   b.  additional asset purchases of $677,711; and

   c.  loan paydowns of $550,886.

OPINIONS

13.    In my opinion, the 2019 Loan enabled Pacific Links to retain cash that was needed to continue development of the Makaha Property and thereby gave Pacific Links additional cash and time to complete development needed to realize projected sales revenue of $539 million.

14.    In my opinion, the net present value of PLG's proposed development, is per their stated plan is $37 million, excluding anticipated discounts.

15.    After discounting the net present value of the Makaha development,

accounting for golf memberships conveyed at a discount in connection with the purchase of real property at the development, it is my opinion that the net present value of the Makaha development at the time of the 2019 Loan was $28.5 million.

16.     In my opinion, Pacific Links demonstrated the feasibility of present sale value relative to the Makaha Property through the actual sale of interests tied to to-be-developed lots on the Makaha Property in 2019.

17.     In my opinion, PLG obtained more time via the 2019 Loan to realize a projected net present value of $36.1 million from the sale golf memberships at the development.

18.     In my opinion, PLUSH was dependent on cash infusions from the Pacific Links related China entities to effectively implement development plans for the Makaha Property, without which the projected value of development would be reduced from Plaintiffs' estimated $37 million to $0.

19.     In my opinion, Pacific Links having received the December 2019 Loan proceeds or delayed repayments/refinancing of prior loans via the December 2019 Loan, provided Plaintiffs additional time to try and generate the cash needed to complete the development, and in turn realize a profit.

20.     In my opinion, it is reasonable to assume that 2019 Loan proceeds were used to pay for an additional $677,711.00 in increased investments into "Buildings and other depreciable assets" between 2019 and 2020.

21.     In my opinion, it is reasonable to assume that 2019 Loan proceeds were

used to pay down debt in the amount of $550,886.00 in 2020 as compared to 2019.

22.     Plaintiffs relied on funding from other Pacific Links entities to fund their budgeted expenditures, and one source of funding for the operations at and development of the Makaha Property was loaned funds from TDH.

23.     Documents produced by Plaintiffs show approximately $1.2 million transferred into PLUSS from December 2019 through March 2021.

24.     The tax assessed value of PLUS Subsidiaries' real property holdings increased by $2.7 million between 2019 and 2022.

25.     In my opinion, goodwill and marketing has value, and Plaintiffs received value of at least $750,000 in the form of goodwill and marketing value from professional golfers, Michelle Wie, Ernie Els and Gil Hanse, for their association with Pacific Links and Plaintiffs.

26.     In my opinion, the new 2019 Loan allowed the TKB and the Pacific Links entities to maintain their cash balances/positions.  That is, had they been forced to repay the old loan, without extension, they would have had less cash available.

BASES FOR MY OPINIONS

    a.  <u>Development of Makaha Property per Plaintiffs' stated plan</u>

27.     To arrive at my opinion that PLUSH and its Subsidiaries had an expected net present sales value of $37 million, I reviewed the "Makaha Valley Destination Report Preliminary Engineering Report" (the "Engineering Report") dated March 2019 that was produced by Stanford Carr and the projections produced

by Stanford Carr found in file "Makaha_Financial_Analysis_v11_2019.07.03 ("Makaha Projections").

28.     The Engineering Report describes planned development of the properties to consist of 30 10,000 sf single family lots, 264 8,000 sf single family lots, 200 5,000 sf single family lots, 152 condo units with a lobby/recreation building, 2 premier golf courses with golf clubhouse and retail village.

29.     The Makaha Projections show Pacific Links' plan was to sell "memberships and homes."  The projections show that as late as 2019, Mr. Carr and the PLUSH Entities believed and expected that the homes sales had a value of $37 million.  The Makaha Projections reduced the undiscounted net sales value ($57 million) to a present value of $37 million using a discount rate of 15%.

30.     The 2019 Loan Proceeds were likely used to extend Plaintiffs' time to complete the development and realize the projected sales revenue.

b.  Sale of memberships and lot tiers sales connected to the Makaha development per actual sales

31.     We reviewed a letter for Mr. Du. to Mr. Carr explaining the business plan relative to the sale of memberships tied to developed lots in the development, which states that, "[g]olf course memberships for the two courses once built, would be sold at a discount of 2/3 the set price if bought in conjunction with a piece of real estate."

32.     Then I compared the actual "Membership/Lot Tiers" sales amounts

found on the "20191010 China Sales Record – Translated" file to the Makaha Financial Analysis v11 file noted *supra*.

33.     My analysis shows actual "Full Payment" purchases were approximately 93% of the "Membership/Lot Tiers" projected sales price.

34.     Therefore, I reduced the "Membership/Lot Tiers" estimated price by 7% to reach a recalculated net present value of the development in the amount of $28.5 million.

      c.   <u>Demonstrated feasibility of present sale value of to-be-developed single family lots</u>

35.     I reviewed records relating to sales of interests in the Makaha lots to Chinese investors.  The proof of claim, contracts and China Sales Record reflect that even before completion of the development plan, the promise of future development and delivery of subdivided and improved lots in accordance with the development had present value.

36.     The China Sales Record indicates that by April 2019, RMB 36,653,844 (approximately $5.5 million) was generated from the sale of memberships tied to 31 to-be-developed lots in Makaha (with 12 lots paid in full, and 19 lots held with down payments or deposits).

      d.   <u>Value of golf memberships</u>

37.     I reviewed the "Pacific Links International President Membership and Makaha Resort" book (the "Book") prepared by Pacific Links.

38.    The Book, on page 5, states that the price/entrance fee for Pacific Links membership as a "New President Members 2019" is $188,000.

39.    Pursuant to the Book memberships are limited to 700 members per course.

40.    Had Pacific Links sold the maximum number of golf memberships for the Makaha Property, it would have earned revenues of $131.6 million (700 memberships × $188,000).

41.    I used the same discount rate of 15% to discount the values of the membership sales cash flows and found that the value of the memberships was $37.9 million.

     e.    <u>Impact on benefits and value Plaintiffs received considering their dependence on funding from Pacific Links related China entities for their development plan</u>

42.    I reviewed Plaintiffs' 2018 and 2019 tax returns and concluded that Plaintiffs' operations were not generating sufficient cash to fund the development project in Makaha.

43.    Funds to complete the development had to come from other sources, including loans and capital contributions.

44.    I reviewed the bank statements for Pacific Links U.S. Services that show Pacific Links related China entities transferred substantial amounts to Pacific Links North America entities.

45.    In December 2019, PLUSH's controller, Logan Webber sent an email

to CFO Harry Chang stating that the PLUSH Subsidiaries needed an additional $4,000,000.00 in cash over the next three months to support its operations and the Makaha development (including debt service). Mr. Webber labeled the amount, "Total Projected Shortfall."

46. It is reasonable to assume that 2019 loan proceeds were used to cover the shortfall.

47. Bank statements for Pacific Links U.S. Services reflect that Pacific Links related China entities transferred $400,000 on 12/18/2019 and $400,000 on 01/10/2020.

48. Had PLUSH not received sufficient cash either through loans, capital contributions or some other source, it could not have completed the development reducing the value of the project from their estimated $37 million to $0.

f. The value of time provided by the 2019 Loan

49. Time was a value received by Plaintiffs due to the 2019 Loan.

50. The Makaha development needed time to sell more lots and golf memberships which would have increased cash flow for direct construction costs, overhead and debt service.

51. PLUSH and its subsidiaries receiving additional loan proceeds or delayed repayments/refinancing of prior loans in December 2019, provided PLUSH and its subsidiaries time to try and generate the cash needed to complete the development.

g.  Increase in value of buildings and other depreciable assets

52.     I compared the 2019 and 2020 tax returns for Plaintiffs and found that, during 2020, an additional $677,711 was invested into "Buildings and other depreciable assets."

53.     Plaintiffs were not producing sufficient cash to pay for additional assets, therefore it is reasonable to assume that Pacific Links entities provided funds to make these payments, which was made possible through the 2019 Loan.

h.  Decrease in mortgages, and notes longer than 1 year

54.     I compared the 2019 and 2020 tax returns for Plaintiffs and found that, during 2020, "Mortgages and Notes Longer than 1 Year" ("Long Term Debt") was reduced during 2020 by $550,886.

55.     Plaintiffs were not producing sufficient cash to pay for additional assets, therefore it is reasonable to assume that Pacific Links entities provided funds to make these payments, which was made possible through the 2019 Loan.

i.  Paid in Capital and Support from China

56.     It is my understanding that many of the Pacific Links related China entities failed to produce their complete accounting and banking records.  As such, I was unable to fully race the flow of funds from lender to borrower, and then from borrower to Plaintiffs.

57.     However, I reviewed Plaintiffs' 2020 federal income tax return and found that during 2020, additional paid in capital increased by $7 million (from

$59.8 million to $68.8 million).

58.     Mr. Weber testified that the treatment of funds from China to Plaintiffs would be recorded in Plaintiffs' accounting records as paid in capital.

59.     Given this evidence, it is likely that the Pacific Links entities contributed an additional $7 million to Plaintiffs during 2020.

60.     Based upon my review of Plaintiffs' tax returns and the deposition transcript of Logan Weber, I understand that PLUSS provided the back office functions, such as accounting for Plaintiffs.

61.     It is reasonable to assume in this case, while 2019 Loan proceeds were not directly received by Plaintiffs, they were used by the Pacific Links entities to pay back office/overhead expenses that benefitted Plaintiffs.

62.     Plaintiffs relied on funding form other Pacific Links entities, using TDH loan proceeds, to meet their budgeted expenditures.

j.     Funds transferred into Pacific Links U.S. Services, Inc. ("PLUSS")

63.     Between April 2016 and March 2021, at least $40,038,765.00 was transferred into PLUSS bank accounts at Chase Bank (acct 9772) and First Hawaiian Bank (acct. # unknown).

64.     From December 2019 through March 2021, at least $1.2 million was transferred into PLUSS bank accounts at Chase Bank (acct 9772) and First Hawaiian Bank (acct. # unknown).

k.     Increase in tax assessed value of the Makaha Property

65.     I analyzed the tax assessed values of the properties owned by PLUSH and its subsidiaries and found the assessed values increased approximately $2.7 million between 2019 and 2022.

66.     I did not evaluate the fair market value of these properties. While the tax assessed values are not a direct indicator of the fair market value of these parcels increase in value, as a general statement, the fair market value of properties in the area are likely to have risen in fair market value, thereby giving rise to the increased tax assessed value of these properties.

l.     Value of goodwill and marketing

67.     I reviewed the "Makaha Resort Balance Sheet 12.31.19."

68.     The Schedule of payments show payments due to Ms. Wie, Mr. Els and Gil Hanse after December 2019.

69.     Based on deposition testimony of PLUSH's appointed representative, at pages 65-68, well-known golfers and designers associated with PLUSH and its subsidiaries golf courses provide value via increased good will and reputation.

70.     Based upon the Scheduled of Payments, PLUSH and its subsidiaries received value of at least $750,000.00.

m.     Cash value to PLUSH and PLUSH Subsidiaries of the 2019 Loan Extension

71.     I reviewed the file named "30-DEBTORS 010398-Loan Transfers" which show the individual transactions related to the repayment and reissuance of

loan proceeds.

72.     Specifically, the above file shows on or about 11/27/2019 RMB 100 million was loaned to the debtor.

73.     This amount brought the total loan balance to RMB 400 million.

74.     Between 12/13/2019 and 12/18/2019 a total of RMB 400 million was repaid by the debtor to the lender.

75.     Between 12/13/2019 and 12/19/2019 RMB 400 million was reloaned to the debtor.  Basically, leaving the debtor in exactly the same place it was prior to the December 2019 transaction.

76.     Even though the new and old loan balances apparently remained unchanged, the new loan allowed TKB and the PLG entities to maintain their cash balances/positions.  This is, had Pacific Links been forced to repay the prior loan, without extension, they would have less available cash.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED:  Honolulu, Hawaii; June 13, 2022.

_____
GARRET HOE, CPA

ONTARIO
SUPERIOR COURT OF JUSTICE

BETWEEN:

TIANJIN DINGHUI HONGJUN EQUITY INVESTMENT
PARTNERSHIP (LIMITED PARTNERSHIP)

Applicant

- and -

SHA DU

Respondent

EXAMINATION FOR DISCOVERY OF SHA DU
held via Arbitration Place Virtual
on Tuesday, May 24, 2022, at 3:00 p.m.

REVISED TRANSCRIPT

APPEARANCES:

Guneev Bhinder                on behalf of the Applicant

Junior Sirivar               on behalf of the Respondent

Maria Amparo McCormick        on behalf of U.S. TDH
Michelle Chapman

Christopher Muzzi             on behalf of the U.S.
                              Pacific Link entities

ALSO PRESENT:

Mary Wang                            Interpreter
David Zhou
Harry Chang
Huang Xingyu
Yazhi Zheng

Arbitration Place © 2022
940-100 Queen Street          900-333 Bay Street
Ottawa, Ontario K1P 1J9       Toronto, Ontario M5H 2R2
(613) 564-2727                (416) 861-8720

INDEX

                                                          PAGE


AFFIRMED:  SHA DU                                          4

AFFIRMED INTERPRETER: MARY WANG (MANDARIN)                 4

EXAMINATION BY MS. MCCORMICK:                             4

LIST OF REFUSALS


Refusals (REF) found at pages: 10, 12, 14, 23, 38,

42, 57, 73

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 33 of 77
(613) 564-2727                                          (416) 861-8720

LIST OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Ownership structure chart, Pacific Links Group of Companies | 9-10 |

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 34 of 77

Arbitration Place
(613) 564-2727                                    (416) 861-8720

1                            Arbitration Place Virtual

2       --- Upon commencing on Tuesday, May 24, 2022,

3           at 3:00 p.m.

4       AFFIRMED:  SHA DU

5       AFFIRMED INTERPRETER: MARY WANG (MANDARIN)

6       EXAMINATION BY MS. MCCORMICK:

7    1                    Q.   Good morning, Mr. Du. My

8       name is Maria Amparo McCormick, and I represent

9       the applicant and defendant in this case, TDH.

10                           Have you had your deposition

11      taken before?

12                           A.   Who?

13                           MS. MCCORMICK:  I'm asking if

14      Mr. Du has had his examination taken before in any

15      other case.

16                           THE WITNESS:  No.

17                           BY MS. MCCORMICK:

18   2                    Q.   Have you testified in

19      court before?

20                           A.   No.

21   3                    Q.   The purpose of this

22      examination is for us to learn more about Pacific

23      Links Group, the Plaintiffs, and their financials.

24      Your testimony here today is being preserved

25      through a transcript that is being prepared by the

Arbitration Place
(613) 564-2727                                        (416) 861-8720

1    court reporter. We want to make sure that you have

2    enough time to think about your answers and the

3    court reporter is able to get a complete record of

4    what we say here today.

5                         Do you understand that?

6                         A.   Yes, I understand.

7    4                    Q.   Please answer out loud to

8    the questions because the court reporter cannot

9    take down any nods or gestures.

10                        Do you understand that?

11                        A.   I got it.

12   5                    Q.   If you do not understand

13   a question, please let me know and I will try to

14   rephrase it, okay?

15                        A.   I understand.

16   6                    Q.   Do you understand that

17   you are testifying here today under oath?

18                        A.   Yes, I understand.

19   7                    Q.   During the examination

20   we'll take breaks from time to time. If you need a

21   break, please let me know.

22                        A.   Thank you, I got it.

23   8                    Q.   Do you have any questions

24   so far?

25                        A.   No.

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 36 of 77

```
1                         A.    I'm an investor.

2    57                   Q.    You are also the ultimate

3    owner of Pacific Links Group, correct?

4                         A.    Correct.

5    58                   Q.    Approximately how many

6    employees would you say that worked at Pacific

7    Links Group in 2019?

8                         A.    I don't know. I'm not so

9    sure about that.

10   59                   Q.    What about approximately?

11   Hundreds?  100?  200?

12                        A.    No approximate. When I

13   say I don't know, I mean I don't know.

14   60                   Q.    But as the owner of

15   Pacific Links Group, you don't know if there were

16   less or more than 100 employees?

17   REF                  MR. SIRIVAR:  In fairness,

18   counsel, you asked if he was the ultimate owner

19   and he said he was the ultimate owner. I'm not

20   sure that it's fair to say that he's the owner.

21                        BY MS. MCCORMICK:

22   61                   Q.    Besides you, Mr. Du, are

23   there any other owners of Pacific Links Group?

24                        A.    For the Chinese company

25   I -- with the Chinese companies I do not have
```

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 37 of 77
(613) 564-2727                                                    (416) 861-8720

1    CEO you mean?

2                          MS. MCCORMICK:  For whatever

3    companies he's referring to as him being the CEO

4    for.

5                          THE WITNESS:  I -- the thing

6    is, I cannot remember clearly how many companies

7    he worked as -- he worked for in the capacity of

8    CEO. I do not know, but he was the CEO for the

9    majority of the companies.

10                         BY MS. MCCORMICK:

11   98                    Q.   And what years was he the

12   CEO for the majority of the Pacific Links China

13   companies?

14                         A.   He'd been the CEO since

15   the start of the company until the termination of

16   the companies due to the COVID.

17   99                    Q.   So when did the companies

18   start?  What year?

19                         A.   I'm not sure the specific

20   years. Approximately the start -- the company

21   started during the time period of 2011 to 2013.

22   During that period of time.

23   100                   Q.   So if let's say that the

24   companies started around 2013, is it your

25   understanding that the companies in China were

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 38 of 77

1       being successful in selling golf memberships?  For

2       example, the year that they started in 2013?

3                            A.    The information I

4       received indicated that this been very successful.

5   101                      Q.    What about the years

6       after 2013?  Were these sales of golf memberships

7       being -- were the companies being successful in

8       selling the golf memberships in, for example,

9       2015?

10                           A.    The companies are getting

11      better year after year.

12  102                      Q.    What about in 2017?

13                           A.    The same.

14  103                      Q.    So during all the years

15      they were just getting better and better until

16      COVID hit, is that correct?

17                           A.    Correct.

18  104                      Q.    So Pacific Links China

19      made a lot of money in golf -- in sales of golf

20      memberships in 2017, 2018, and 2019 until COVID

21      hit, correct?

22                           A.    That's the information I

23      received.

24  105                      Q.    And you were receiving

25      that information through the financials and other

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 39 of 77
(613) 564-2727                                          (416) 861-8720

1     information given to you by the CEO of Pacific

2     Links China?

3                        A.   Sometimes this

4     informations are from CFO.

5  106                   Q.   And who is that person?

6     What's the name of that person?

7                        A.   Hongwei Zhang.

8                        THE INTERPRETER:  I will spell

9     his name. The first name Hongwei, H-O-N-G-W-E-I,

10    Zhang Z-H-A-N-G.  That's a lady.

11                       BY MS. MCCORMICK:

12 107                   Q.   And this person is the

13    CFO of the companies in China, correct?

14                       A.   My understanding as for

15    her role, yes; however, to confirm that you need

16    to double-check with the registration documents.

17 108                   Q.   So since 2013 that you

18    testified that it would be the approximate year

19    that the entities of Pacific Links China started,

20    up until COVID, would you agree that Pacific Links

21    Group China have been growing and was a successful

22    company?

23                       A.   In terms of sales of

24    memberships and providing services to the members,

25    yes, I agree with you, these companies had been

U.S. Bankruptcy Court - Hawaii  #21-90009  Dkt # 170  Filed  06/13/22  Page 40 of 77

1        very successful.

2    109                    Q.    Were you proud of the

3        success, Mr. Du?

4                           A.    Of course, because I made

5        the right investment in that, meaning my

6        investment decision was the right one or right for

7        one.

8    110                    Q.    During these years that

9        Pacific Links Group was building its success since

10       we talked about since 2011 or 2013, did Pacific

11       Links Group experience any cash flow issues?

12       REF                    MR. MUZZI:  I object, lack of

13       foundation.

14                           MS. BHINDER:  I note that as

15       Mr. Muzzi is not representing Mr. Du, he does not

16       have standing to object to questions.

17                           MR. SIRIVAR:  Just to be

18       clear, I don't agree with that at all. This is a

19       deposition being taken in furtherance of a U.S.

20       proceeding in which Mr. Muzzi represents the party

21       that is adversary to Ms. McCormick's client. He

22       has standing to object on behalf of the company in

23       relation to matters involving the U.S. proceeding.

24                           MS. BHINDER:  I disagree -- go

25       ahead.

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed 06/13/22   Page 41 of 77
(613) 564-2727                                                    (416) 861-8720

1    objection.

2                                    THE WITNESS:  This is a very

3    detailed question. In terms of a detailed question

4    like this, I -- I'm not sure.

5                                    BY MS. MCCORMICK:

6    114                  Q.    To your understanding,

7    Mr. Du, did Pacific Links -- was cash an issue

8    from 2013 to 2019?  What is your understanding, if

9    you know?

10                                   A.   First of all, I did not

11   have specific informations regarding your

12   question. This is the first thing.

13                                   And then, secondly, as I

14   mentioned earlier, the sales of the memberships

15   has been very successful, and it's getting better

16   and better -- it was getting better and better.

17                                   Thirdly, as the management

18   team purchased many golf courses which cost

19   significant amount of money.

20                                   As for what you mentioned

21   regarding the cash flow issue, I do not know.

22   115                  Q.    Would you still call the

23   Pacific Links Group successful as of today?

24                                   A.   I told you already. I

25   will repeat what I said. The sales of the

Arbitration Place
U.S. Bankruptcy Court - Hawaii  #21-90009  Dkt # 170  Filed  06/13/22  Page 42 of 77
(613) 564-2727                                                    (416) 861-8720

1          memberships of Pacific Links Group in China had

2          been very successful.

3    116                    Q.    I'm referring -- my

4          question refers as of today.

5                          Would you, Mr. Du, as you sit

6          there today, would you still consider Pacific

7          Links Group successful?

8                          A.    I will say it again to

9          you. During the year of 2013 to 2019 before COVID

10         the sales of memberships had been very successful

11         in China.

12   117                    Q.    Is Pacific Links Group

13         currently operating?

14                          A.    I already told you no. No

15         more operation.

16   118                    Q.    None of the companies of

17         Pacific Links Group?

18                          A.    I do not know the

19         specifics.

20   119                    Q.    I'm going to move to now

21         focus on the Plaintiffs, which we defined early

22         this morning as to the entities that are part of

23         the proceeding in Hawaii in our Pacific Links U.S.

24         holdings, MVCC LLC, MGCW LLC, and then all the

25         MDREs.

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 43 of 77
(613) 564-2727                                                      (416) 861-8720

1                         A.   It's not totally true.

2    The framework agreement was entered into and

3    executed on November 11, 2019 -- December 11th,

4    not November. That agreement was entered into and

5    executed on December 11th.

6                         On the day of the signing the

7    loan agreement, both my wife and myself were at

8    Yellowknife watching the north lights, enjoying

9    the north lights. We were not in China. This issue

10   still was dealing with in the court proceedings,

11   so I cannot answer this question.

12                         MR. SIRIVAR:  I think, Ms.

13   McCormick, you have what you need. You can tell

14   that there's a contentious component that's

15   outside the scope of your deposition, but I think

16   -- did you get the answer that you need?

17                         MS. MCCORMICK:  We can move

18   forward.

19                         MR. SIRIVAR:  Thank you.

20                         BY MS. MCCORMICK:

21   193                   Q.   In 2019 did you contact

22   TDH and request an extension to repay the prior

23   loans?

24                         A.   Yes, I communicated with

25   the boss, Mr. Wu, regarding this matter, regarding

Arbitration Place
(613) 564-2727                                        (416) 861-8720

1          this.

2     194                    Q.   Can you tell me more

3     about this?  Can you tell me what month of 2019

4     you reached out to him?

5                           A.   We had many

6     communications at that time.

7     195                    Q.   Do you recall around what

8     month of 2019 you were having those

9     communications?

10                          A.   I don't recall but I do

11    remember I went to his office.

12    196                    Q.   And you had these

13    communications in person or --

14                          A.   Yes, we had in-person

15    communication.

16    197                    Q.   Can you tell me how that

17    in-person meeting went?  What was discussed?

18                          A.   Wu had great confidence

19    in the future of the Pacific Links, so both of us

20    agreed that it would be mutual benefit to extend

21    the mature date of the loan -- maturity date of

22    the loan.

23    198                    Q.   Anything else that you

24    want to explain about that meeting?

25                          A.   He told me -- he promised

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 45 of 77
(613) 564-2727                                                    (416) 861-8720

```
 1      to me that he would phone his management team and

 2      to have management team to extend the maturity

 3      date of the loan.

 4   199                Q.   And what happened after?

 5                      A.   There are a lot of things

 6      happening in the world. When you say "what

 7      happened after", what are you referring to

 8      specifically?

 9   200                Q.   Did the manager call you,

10      or did Mr. Wu get back to you after that

11      conversation?  What was the ultimate response?

12                      A.   After I finished my

13      conversation with him I just left. I either went

14      back to Canada or I went to some other places to

15      go for a coffee. And the management team, you

16      know, started work on that.

17   201                Q.   How did you receive the

18      news that your request was accepted?  Did you

19      receive a call from management?  Did you receive

20      an email?  Or did you meet with TDH again in

21      person?

22                      A.   I did not recall what

23      type of manner to be notified of the result, but I

24      do recall the management team, because I know the

25      persons from the management team -- I do recall
```

Page 68

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 46 of 77

1        the management team told me the result.

2                            THE INTERPRETER:  May I ask

3        him to see whether I finished?  It seems to me I

4        missed something here. May I?

5                            MS. MCCORMICK:  Sure.

6                            THE WITNESS:  I recall his

7        management team told me about the result, and my

8        management team told me this news as well. All in

9        all we've been moving these things forward in a

10       friendly manner or amicable manner.

11                           BY MS. MCCORMICK:

12   202                     Q.   Why -- what was the

13       reason you reached out to TDH to request that

14       extension?

15                           A.   I don't know. You know,

16       what I can tell you is that we had our

17       conversation in a very friendly environment,

18       atmosphere, because both of us have great

19       confidence in the future for the development for

20       the project.

21   203                     Q.   So what was your plan to

22       repay the loans to TDH, Mr. Du?

23                           A.   The boss of TDH didn't

24       ask me about the plan. He only told me one

25       sentence, which -- he only told me one sentence,

Page 69

```
 1        which I was that -- it's very hard -- it's that I
 2        will -- I would tell my management team that it's
 3        very hard to find a business in China with such a
 4        good cash flow.
 5    204              Q.   So because TDH and you
 6        had this confidence in the future of Pacific Links
 7        Group, your understanding was that you could
 8        easily pay back the loans, is that accurate?
 9                          THE INTERPRETER:   Counsel,
10        sorry I have to ask you to repeat your question,
11        please.
12                          BY MS. MCCORMICK:
13    205              Q.   You testified that you
14        and TDH had confidence in the future of Pacific
15        Links Group, correct?
16                          A.   Both of us touched upon
17        the futures of the Pacific Links, and he even gave
18        us some good suggestions.
19    206              Q.   So did you think that
20        paying back the loans was going to be an issue?
21                          A.   If it wouldn't be the
22        COVID-19, there wouldn't be any issue.
23    207              Q.   Because of the bright
24        future, correct?  For Pacific Links?
25                          A.   In China, yes.
```

Arbitration Place

U.S. Bankruptcy Court - Hawaii  #21-90009  Dkt # 170  Filed  06/13/22  Page 48 of 77
(613) 564-2727                                                      (416) 861-8720

1    alive to the issue, and I have asked Ms. McCormick

2    to focus her questions so we can get out of here

3    in a reasonably prompt period of time.

4                        BY MS. MCCORMICK:

5    222                 Q.   So I just finished with

6    that topic we were talking about. In order to get

7    this done as soon as possible I'm just going to be

8    asking some general questions as to your

9    understanding of certain things, Mr. Du.

10                       THE INTERPRETER:  The last

11   part is officer of the company, counsel?  The last

12   part of your question was?  I didn't quite catch.

13                       MS. MCCORMICK:  I'm just going

14   to ask general questions about a few topics so we

15   can finish this.

16                       THE WITNESS:  Thank you.

17                       BY MS. MCCORMICK:

18   223                 Q.   We touched base on this a

19   little bit before with respect to the sale of the

20   potential units on the Makaha Property.

21                       Do you remember that

22   testimony?

23                       A.   Yes.

24   224                 Q.   Okay, so I just want to

25   know generally what is your understanding as to

Arbitration Place
(613) 564-2727                                            (416) 861-8720
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 49 of 77

1        the sale of the lots of the Makaha Property.  Were

2        they being sold to Chinese investors?

3                            A.   Our members, we hoped

4        that they would come -- they would be here to

5        purchase the property here.

6    225                     Q.   But there were certain

7        lots that they were sold to Chinese people,

8        correct?

9                            A.   No. No, we only sold a

10       dozens of membership cards.

11   226                     Q.   So your testimony is that

12       no lots were sold to individuals?

13                           A.   Our plan was that -- and

14       after we completed the development we would gave

15       some of the lots to our members for free. That was

16       our plan. Unfortunately everything stopped due to

17       COVID.

18   227                     Q.   When did you expect for

19       the Makaha lots to be sold to the members that you

20       just testified?

21                           A.   It's not my business. It

22       was management's business. It was management

23       team's business.

24   228                     Q.   So you don't know when

25       the lots were supposed to be sold, correct?

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 50 of 77

(613) 564-2727                                              (416) 861-8720

```
 1                        A.   I don't know.

 2   229                  Q.   Did you expect to make a

 3      profit off the sale of those lots?

 4                        A.   I never had any

 5      expectations before the business ended, or over.

 6      Because expectation is minilist (sic) in the

 7      market.

 8   230                  Q.   So we went through the

 9      sale of the lots and you testified about sales of

10      memberships.

11                        Does the sale of memberships

12      also refer to the Makaha Property?

13                        A.   Membership sales are

14      mainly -- were mainly related to the two golf

15      courses because those two golf courses would be

16      world class golf courses.  To become a member of

17      those golf courses would be a great honour.

18   231                  Q.   You're referring to the

19      golf courses at the Makaha Property, correct?

20                        A.   Yes, the two golf

21      courses.

22   232                  Q.   So how many approximate

23      golf memberships to play at the Makaha golf

24      courses were sold?

25                        A.   25 to 26.
```

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 51 of 77
(613) 564-2727                                              (416) 861-8720

1   233                    Q.   And what entity of

2   Pacific Links received the proceeds from those

3   sales of golf memberships?

4                          THE INTERPRETER:  What

5   happened, right, counsel?

6                          MS. MCCORMICK:  What company

7   received the sale proceeds from the golf

8   memberships?

9                          THE WITNESS:  First of all,

10  it's again, which company would benefit from the

11  proceeds of sales of those memberships, that's

12  management team's business.  Of course personally I

13  felt it should be the Makaha companies who

14  received the benefits -- sorry, the two golf

15  course -- the two golf courses were the

16  beneficiary or received the benefits of the

17  proceeds of the sales of the memberships.

18                         BY MS. MCCORMICK:

19  234                    Q.   But did those two

20  companies receive the money from the sale of the

21  golf memberships?

22                         THE INTERPRETER:  Receive the

23  money?

24                         MS. MCCORMICK:  The money.

25                         THE WITNESS:  I do not know

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 52 of 77
(613) 564-2727                                              (416) 861-8720

1     for Mr. Du to turn off his camera for five

2     minutes?

3                              MR. SIRIVAR:  Yes.

4                              MS. MCCORMICK:  Thank you.

5     --- Recess taken at 7:09 p.m.

6     --- On resuming at 7:18 p.m.

7                              BY MS. MCCORMICK:

8     242                      Q.  Mr. Du, before we took

9     the short break we were talking about the five

10    golf courses that are owned by Pacific Links

11    China.

12                             Do you remember that

13    testimony?

14                             A.  Correct.

15    243                      Q.  Do you know how much

16    these five golf courses in China were worth in

17    2019?

18                             A.  I don't know because the

19    value decided by the market.

20    244                      Q.  Do you know how much

21    Pacific Links paid for these golf courses when

22    Pacific Links acquired the golf courses?

23                             A.  Approximately it spent --

24    they cost 150 million -- 1.5 billion.

25    245                      Q.  1.5 billion RMB or U.S.

                                                    Page 85

U.S. Bankruptcy Court - Hawaii  #21-90009  Dkt # 170  Filed  06/13/22  Page 53 of 77
(613) 564-2727                                      (416) 861-8720

1        dollars?

2                                    A.    RMB.

3     246                  Q.    1.5 billion US dollars

4     for the five?

5                                    MR. SIRIVAR:   No, that's not

6     what the witness said.

7                                    THE WITNESS:   1.5 billion RMB

8     for the five golf courses.

9                              BY MS. MCCORMICK:

10    247                  Q.    For the five golf

11    courses, correct?

12                                 A.    Correct. There were three

13    to four golf courses were purchased, and then get

14    rid of them or close them.

15    248                  Q.    Can you repeat that

16    again?

17                              THE INTERPRETER:  He's saying

18    that, yeah, we -- it cost approximately

19    1.5 billion RMB to have acquired that five golf

20    courses.

21                              THE WITNESS:  This number I

22    gave to you is approximate number. It's not exact

23    amount, the cost.

24                              BY MS. MCCORMICK:

25    249                  Q.    What's the now plan for

Arbitration Place
U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 54 of 77
(613) 564-2727                                                    (416) 861-8720

I HEREBY CERTIFY THAT I have, to the best of my

skill and ability, accurately recorded by

shorthand, and transcribed therefrom, the foregoing

proceeding using real-time computer-aided

transcription.



_____

Rubina Jan, Certified Court Reporter

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 170   Filed  06/13/22   Page 55 of 77

1              IN THE UNITED STATES BANKRUPTCY COURT

2                  FOR THE DISTRICT OF HAWAII

3   - - - - - - - - - - - - - - - - - - - x

4   In re:                               :

5   PACIFIC LINKS U.S. HOLDINGS, INC.,   :

6   a Delaware Corporation,              :

7            Debtor/debtor in Possession,:

8   - - - - - - - - - - - - - - - - - - - x

9   This Adversary Proceeding relates to: :  CASE NO.

10  ALL CASES                            :   21-00094

11  - - - - - - - - - - - - - - - - - - - x

12  PACIFIC LINKS US HOLDINGS, INC.;     :

13  HAWAII MVCC LLC; HAWAII MGCW LLC;    :

14  MDRE LLC; MDRE 2 LLC; MDRE 3 LLC;    :

15  MDRE 4 LLC and MDRE 5 LLC,           :

16            Plaintiffs,                :

17  v.                                   :

18  TIANJIN DINGHUI HONGJUN EQUITY       :

19  INVESTMENT PARTNERSHIP (LIMITED      :

20  PARTNERSHIP),                        :

21            Defendant.                 :

22  - - - - - - - - - - - - - - - - - - - x

23            Zoom Deposition of LOGAN WEBER

24            Saturday, April 16, 2022

25                 8:07 a.m.

1  Pages 1 through 114

2  Reported by:  Cassandra E. Ellis, CSR-HI #475, CSR-CA

3  #14448, CCR-WA #3484, RPR #823848, CRR, Realtime Systems

4  Administrator

5

6              Deposition of LOGAN WEBER, held pursuant

7  to agreement, before Cassandra E. Ellis, Certified

8  Shorthand Reporter - Hawaii #475, Certified Shorthand

9  Reporter - California #14448, Certified Court Reporter -

10  Washington #3484, Registered Professional Reporter

11  #823848, Certified Realtime Reporter, Realtime Systems

12  Administrator.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  A P P E A R A N C E S

 2        ON BEHALF OF PLAINTIFF:

 3              CHRISTOPHER J. MUZZI, ESQUIRE

 4              TSUGAWA LAU & MUZZI

 5              Harbor Court

 6              55 Merchant Street, Suite 3000

 7              Honolulu, Hawaii  96813

 8              (808) 531-0490

 9              Cmuzzi@hilaw.us

10

11        ON BEHALF OF THE DEFENDANT:

12              MARIA AMPARO V. MCCORMICK, ESQUIRE

13              MICHELLE J. CHAPMAN, ESQUIRE

14              CASE LOMBARDI & PETTIT

15              Pacific Guardian Center, Mauka Tower

16              737 Bishop Street, Suite 2600

17              Honolulu, Hawaii  96813

18              (808) 547-5400

19              Mav@caselombardi.com

20              Mjc@caselombardi.com

21

22   ALSO PRESENT:  Harry Chang; David Zhou

23

24

25
```

1               C O N T E N T S

2 EXAMINATION OF LOGAN WEBER            PAGE

3      By Ms. McCormick                   6

4

5                E X H I B I T S

6          (Attached to the Transcript)

7 LOGAN WEBER       Deposition Exhibit       PAGE

8 Exhibit 1   08/07/2019 E-mail string RE: Cash     44

9      Budget for 2019 w/attachment(s)

10 Exhibit 2   11/01/2019 E-mail 2020 Budget Files    45

11      W/Attachment(s)

12 Exhibit 3   11/21/2019 E-mail 2020 Cash Flow      48

13      W/Attachment(s)

14 Exhibit 4   12/04/2019 E-mail 2020 90 Day CF       53

15      December 2019 - February 2020

16      W/Attachment(s)

17 Exhibit 5   01/09/2020 E-mail string RE: PL NA     61

18      Cash Flow Forecast Q1 January - March 2020

19      W/Attachment(s)

20 Exhibit 6   12/09/2019 E-mail string RE:         69

21      Revised forecast - Makaha w/Attachment(s)

22 Exhibit 7   01/07/2020 E-mail Makaha Development   74

23      Budget Re-draft 1/7/20 w/Attachment(s)

24 Exhibit 8 01/13/2020    E-mail Full Year Corporate   77

25      Budget vs Actual w/Attachment(s)

1          E X H I B I T S    C O N T I N U E D

2               (Attached to the Transcript)

3    LOGAN WEBER        Deposition Exhibit              PAGE

4    Exhibit 9   11/20/2019 Makaha Valley Country       92

5         Club Sale Program Summary Bates Stamped

6         Debtors 007605

7    Exhibit 10  Chase Statement Bates Stamped          94

8         Debtors (R) 010546-549

9    Exhibit 11  Chase Statement Bates Stamped          95

10        Debtors (R) 011355-358

11   Exhibit 12  Chase Statement Bates Stamped          98

12        Debtors (R) 011359-362

13   Exhibit 13  Chase Statement Bates Stamped          99

14        Debtors (R) 011383-386

15   Exhibit 14  Chase Statement Bates Stamped          101

16        Debtors (R) 011457-464

17   Exhibit 15  Chase Statement Bates Stamped          103

18        Debtors (R) 011545-548

19   Exhibit 16  Chase Statement Bates Stamped          104

20        Debtors (R) 011553-556

21   Exhibit 17  Chase Statement Bates Stamped          105

22        Debtors (R) 011557-560

23

24

25

P R O C E E D I N G S

LOGAN WEBER

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. MCCORMICK:

Q.   Good morning, Mr. Weber.  My name is Maria Amparo McCormick, and I represent TDH in this action.

Is Chris Muzzi your attorney?

A.   Yes, he is.

Q.   Have you had your deposition taken before?

A.   No, first time.

Q.   Have you testified in court before?

A.   No.

Q.   The purpose of this deposition is to learn a little bit more about the plaintiffs and your role as the controller of Pacific Links Group.  Your testimony is being preserved through a transcript that is being prepared by the court reporter.

We want to make sure that you have enough time to think about the questions you are being asked and your answers and the court reporter is able to get complete answer that you give.

For that purpose, please answer the questions out loud, because the court reporter cannot take down any gestures; do you understand that?

1    A.    Yes.

2    Q.    When I ask you a question, please wait until

3  I'm done with my question, because it is hard for the

4  court reporter to write down when two people are talking

5  at the same time, and I will try to do the same, okay?

6    A.    I understand.

7    Q.    If you do not understand a question, please let

8  me know and I will try to rephrase it, okay?

9    A.    Okay.

10    Q.    If you answer the question that I'm asking, I

11  will assume that you have understood the question, okay?

12    A.    Okay.

13    Q.    Do you understand that you are testifying under

14  penalty of perjury today?

15    A.    Yes.

16    Q.    Do you understand that even though we are not

17  in the courtroom your testimony today has the same

18  importance and significance as it would be if we were --

19  if you were testifying in court?

20    A.    Yes.

21    Q.    We'll take breaks from time to time, and if you

22  need a break before that please let me know, okay?

23    A.    Yes.

24    Q.    The only time that we'll not be taking a break

25  is when a question is pending.  At that time, if there

1    A.   That's correct.

2    Q.   When did you -- when did you start working or

3  get involved with Pacific Links Group?

4    A.   Immediately upon the beginning of my employment

5  with Harry Chang CA.

6    Q.   What was -- what was your role on Pacific Links

7  Group?

8         MR. MUZZI:  Let me just object as to lack

9     of foundation as far as the definition of Pacific

10    Links Group.

11 BY MS. MCCORMICK:

12    Q.   When you worked with Harry Chang, starting in

13  2015, did you provide any services for a company related

14  to Pacific Links US Holdings, Inc?

15    A.   Just to be clear, the employment with Harry

16  Chang CA started in February of 2016.

17    Q.   So during the time that you were employed by

18  Harry Chang's firm, were you providing any services to

19  any company related to Pacific Links US Holdings, Inc?

20    A.   Yes.  Through my employment with Harry Chang, I

21  believe he had a consulting form of agreement with

22  Pacific Links.  And the firm, as a whole, provided an

23  outsourced finance department for that entity.

24    Q.   Were you employed by Pacific Links Holdings,

25  Inc., or any entity related to Pacific Links US Holdings

1    at any time?

2         A.    No.    I was always employed by Harry Chang CA,

3    although technically, in those earlier years, I was an

4    independent contractor.

5         Q.    As an independent contractor, did you provide

6    any services to Pacific Links US Holdings, Inc?

7         A.    Not directly.    I only provided services to

8    Harry Chang CA, who, in turn, would provide services to

9    Pacific Links US Holdings, Inc.

10        Q.    And these services that you provided, through

11   Harry Chang's firm, started in February 2016 to March

12   2022; correct?

13        A.    Could you clarify in which capacity?    Does it

14   matter if I was an independent contractor or an

15   employee?

16        Q.    How -- for the -- what years were you working

17   in your capacity as employee and what years were you

18   working in your capacity as an independent contractor?

19        A.    Okay.    I was an independent contractor

20   classified from February 2016 through April 2019, if I

21   recall correctly.    And from May 2019 on through March of

22   2022 I was an employee.

23        Q.    An employee of Harry Chang CA?

24        A.    Yes, correct.

25        Q.    Thank you.    And after March 2022, to date, you

1  are no longer related to Harry Chang's firm or Pacific

2  Links; correct?

3      A.    That's correct.

4      Q.    During your time as independent contractor,

5  what were your -- what was your job that you did for

6  Pacific Links through -- through Harry Chang's firm?

7      A.    Oh, initially I was in the role of a staff

8  accountant, and I would do very typical accounting and

9  finance-related tasks.

10      Q.    Can you explain to me what those tasks involve,

11  and have a summary of them?

12      A.    Sure.  So we would support the accounts payable

13  and accounts receivable functions of Pacific Links US

14  Holdings, Inc., and its subsidiaries.  I would prepare

15  financial statements, make journal entries, prepare

16  cash-flow forecasts, stuff like that.

17      Q.    Did you also prepare -- my question was:  Did

18  you prepare budgets, as well?

19      A.    Yes.  Yes, I prepared budgets.

20      Q.    And as your -- in your capacity, later, when

21  you become an employee, what was your job, was it the

22  same, was it different, or did you do the same kind of

23  work that you just testified about?

24      A.    Very similar work, perhaps greater scope, as I

25  had gained more experience and more responsibility over

 1    time.

 2         Q.    Can you explain a little bit to me what that

 3    different role would be, like one example?

 4         A.    I mean, from a title standpoint, when I was

 5    initially hired I was a staff accountant, and I would

 6    report to the controller, who would ultimately report to

 7    Harry Chang.   Later on, I was promoted to the position

 8    of -- or, actually, the role of controller.

 9         Q.    Can you -- do you recall when your job title

10    became controller?

11         A.    It would be in the summer or fall of 2017.   I

12    don't recall the exact date.

13         Q.    And when you became controller, in the summer

14    and fall 2017, did you report directly to -- who did you

15    report to at that time?

16         A.    My direct report would be Mr. Harry Chang.

17         Q.    And prior to you becoming a controller in -- in

18    summer or fall 2017, who did you report to?

19         A.    I reported to the controller at the time.

20    There was two different individuals who held that role

21    during that relevant time period.   Those individuals

22    would be Marina Zoubievia, I'm not sure how to spell her

23    name, and Yang Dong Tong.

24         Q.    When you became controller, what -- as a

25    controller, what authority were you given?   I'm trying

Harry Chang.

    Q.  Do you recall if -- and we are still talking about these cash flow reports in the -- in the North America entities -- do you recall if Pacific Links US Holdings and its subsidiaries were they ever cash flow positive?

    A.  Meaning operations internally?

    Q.  Yes.

    A.  I don't recall any time where the golf course operations were significantly cash flow positive.

    Q.  Do you recall when -- when the golf courses were expected to be cash flow positive?

           MR. MUZZI:  Object, lack of foundation, but you can answer.

    A.  Due to some operational improvements in Makaha, I think relatively close to the filing of the bankruptcy we were breaking even and expected perhaps some small profits from Makaha Valley Country Club.

        But on an ongoing basis, over the many years, the vast majority of the time the golf courses were in an operating loss position.

    Q.  By you doing these cash flow reports and budgets did you -- as you were doing them, and you were familiar with these financials and numbers, did you expect or did you know when -- when it was projected

```
 1   that this -- the golf courses were going to be cash flow
 2   positive?
 3        A.   So on an ongoing basis, as you will see in
 4   those budget files, the golf courses were forecasted to
 5   operate at a loss.  It was only due to recent
 6   operational improvements and cost cutting measures that
 7   as we approached the bankruptcy our expectation for
 8   specifically only Makaha Valley Country Club began to
 9   come to an essentially a break-even position or a very
10   small profit expectation.
11        Q.   Was that expectation to -- was that expectation
12   supposed to or expected to improve as the time was going
13   by, due to these operational improvements and cutting
14   measures?
15        A.   I would characterize it as hope rather than
16   expectation.  The -- as a finance person, past
17   performance is the most indicative factor for future
18   performance.
19             So a golf course that's lost money
20   year-over-year, in the past, would reasonably be
21   expected to continue to lose money in the future, until
22   it has demonstrated that it will earn money and increase
23   its earnings period-over-period.
24             (Exhibit No. 5 was marked for
25        identification.)
```

1 called entitlement planning; is that correct?

2     A.   Yes.

3     Q.   And the same for line 11, which is land

4 planning; correct?

5     A.   Yes.

6     Q.   And that will also apply for the survey on line

7 28, and the project offers negotiations in line 29; is

8 that correct?

9     A.   Yes.  The color coding is consistent in what it

10 reflects.

11           MS. MCCORMICK:  You can pull down this

12   exhibit, Michelle.

13           I have another e-mail that I will like to

14   introduce as exhibit, it's the subject is four-year

15   corporate budget versus actual, and it's dated

16   February 13th, 2020.

17           (Exhibit No. 8 was marked for

18   identification.)

19 BY MS. MCCORMICK:

20     Q.  This is an e-mail from you to Harry Chang,

21 dated February 13th, 2020; do you see that, Logan?

22     A.  Yes.

23     Q.  And the subject line is:  Full year corporate

24 budget versus actual; do you see that?

25     A.  Yes.

1    2019 being eventually settled in May of 2019.

2        Q.   With respect to the narrative in the item of

3    MVCC operating deficit, when you -- when the narrative

4    says these revenues led to higher than expected losses,

5    new initiative set forth in 2020 to meet revenue goals,

6    what does this new initiative set forth, mean?  Is it --

7    are you referring to anything specific?

8        A.   Now, my recollection of that time, I don't know

9    if it ever made it into this Excel budget spreadsheet,

10   but I had received a Word document from Karen Ayau, in

11   conjunction Tim Ayau, outlining the revenue initiatives

12   at the golf course to meet the expectations going

13   forward to 2020.

14           Very specifically, I recall one of them, they

15   were exploring selling tee time packages, you know,

16   packages and tee times at Costco in Hawaii.  So they

17   were exploring stuff like that to increase golf course

18   play volumes.

19       Q.   And with respect to the narrative on line 12,

20   where is this Sterling Bank located?

21       A.   I'm hard pressed to remember, exactly, but if I

22   recall correctly it was one of those small taxing

23   islands, either British Virgin Islands or Bermuda or

24   something of that sort.

25       Q.   And the last thing that I have with respect to

1    document?

2              MS. CHAPMAN:  Sure.  Give me a minute.

3              MS. MCCORMICK:  I would like to confirm

4    that what you are referring to is what we have in our

5    mind.

6    BY MS. MCCORMICK:

7        Q.    This is a document called Sales Program

8    Summary, and it's dated November 20th, 2019.  Is -- do

9    you recall if this is what you were previously referring

10   to as the document that you received with respect to the

11   sales program to increase or to -- that effective

12   revenues of the Makaha property?

13       A.    Yes, that is the document I was referring to.

14       Q.    Are you -- are you familiar with the contents

15   of this document?

16       A.    Yes.  When I received it from Karen I had a

17   phone call with her and talked through the various

18   promotions to -- to validate and ensure that I would be

19   able to answer everybody's questions if they came up.

20       Q.    With respect to the -- to the Japan and

21   mainland visitors entry, was your understanding that

22   the -- the projected or the planned players of the

23   Makaha Golf Course were going to be individuals coming

24   from Japan, China, mainly foreign players?

25       A.    So you're referring to the tour companies line,

Japan visitors?

Q.   Yes.  Yes.

A.   Yes, so we have two, I'll call them resellers,
Kato Tours and Tachibana, where, as you likely know,
Japanese individuals favor Hawaii as a tour destination,
as a tourist destination, and they are frequently avid
golfers, so this was a recurring setup that we had where
Kato Tours and Tachibana would advertise specifically to
these Japanese travellers, they were offered foreign
language service and transportation to the golf club.
So if you didn't speak any English you could still get
picked up on a bus from Waikiki, brought up to the golf
course, and play a round with 20 of your traveling
counterparts.

So these were, you know, golf operating
partners we worked with to try and increase volumes at
the golf club.

Q.   Were these advertisement -- these marketing
efforts be happening mostly in China?

A.   I don't know where Kato Tours and Tachibana
would advertise.  I would imagine they would advertise
in Hawaii because this program exclusively focused on
Japanese golf tourism on the island of Oahu.

I do not -- from my understanding, they did not
cater or advertise directly to people from China, just

1  Japan.

2      Q.   And with respect to the Golf Hawaii card, what

3  is your understanding as to that?

4      A.   My understanding is rather limited, but I -- I

5  think this is a, you know, preferential rate program

6  where Golf Hawaii card is its own independent business

7  that signs up -- commits to certain volumes of golf play

8  with local courses and, in exchange for a favorable

9  rate, will facilitate play.

10          To go a little deeper, I think previously, many

11  years ago, there was a program that Pacific Links

12  operated called Golf Now or Golf Oahu or something like

13  that, where we similarly offered a preferential rate for

14  anyone who wanted to play at Pacific Links-owned golf

15  courses in Hawaii, could get a better rates by

16  committing to a certain volume of play.  So they join

17  up, pay a small membership fee in Hawaii, and they could

18  play the Pacific Links-owned golf courses for a lower

19  rate.

20          I did suspect this Golf Hawaii card was a

21  business operating a similar business model.

22      Q.   So based on these sales program summary, was it

23  your understanding that the revenues of the Makaha Golf

24  Course will increase in 2020?

25      A.   Yes, these were the reasons why we had that

1    expectation that revenues would increase.

2       Q.   Okay.  I will -- I would like to also introduce

3    this as an exhibit, mark it as the next exhibit in

4    order.

5              (Exhibit No. 9 was marked for

6       identification.)

7    BY MS. MCCORMICK:

8       Q.   There has been prior testimony, with respect to

9    a golf course called 27 Club, that also appears in some

10   of these financial reports.  Do you have -- do you have

11   any knowledge as to this 27 Club?

12      A.   Yes, I'm aware that Mr. Zhou built a golf

13   course called the 27 Club, in -- in Tianjin, China, and

14   he named it as such as he had 27 different golf pros

15   design each one of the individual holes.

16           This would have been before my tenure at

17   Pacific Links, the building and launching of this club.

18      Q.   Was -- were there any expenses for -- of that

19   golf course of the 27 Club being paid by Pacific Links

20   US Holdings or, I guess, Pacific Links North America?

21              MR. MUZZI:  I'm going to object, vague as

22      to time.

23   BY MS. MCCORMICK:

24      Q.   During the time that you had been a controller?

25      A.   No.  During the time that I was a controller I

# WITNESS CORRECTION SHEET

**CASE: In re: PACIFIC LINKS U.S. HOLDINGS, INC.; CASE NO. 21-00094**

**DEPOSITION OF LOGAN WEBER (ZOOM), TAKEN ON 4-16-22.**

| PAGE | LINE | CORRECTION | REASON |
|------|------|-----------|--------|
| 78 | 23 | change word "second" to "secure" | correction |
| 79 | 6 | change "I have not seen any" to "I do not recall seeing any" | correction |
| 79 | 10 | change "permit" to "remit" | Misspelling |
| 79 | 14 | change "Mr. Zhou" to "Mr. Du" | correction |
| 96 | 16 | change "I have no information" to "I do not recall any information on that company" | |
| 97 | 4 | change "No, I don't have any information" to "I do not recall any specific information on th | |
| 99 | 18 | change "No, I do not know anything about that company" to "I do not recall any specific information on that company" | company |
| 105 | 5 | change "85 loan" to "EB5 loan" | correction |
| 105 | 14 | change "85 loan" to "EB5 loan" | correction |
| 105 | 18 | change "Mr. Zhou" to "Mr. Du" | correction |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _____Logan Weber_____ Date: ___May 11, 2022___

=================================================================

# CERTIFICATE

[X] Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

[ ] Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

[ ] Please be advised that signature and/or corrections were received and are **not being filed** with the transcript because:

    [ ] the deponent failed to sign and/or make corrections within 30 days after notification that the transcript was available for review.

    [ ] a request for an opportunity to review the transcript was **not** made by the deponent or a party before completion of the deposition.

[ ] Please be advised that the above-named case is going to trial and/or hearing and the deponent has **not** had 30 days to read and sign the deposition before the filing of this transcript with the Court.

DATED: 5·11·22 , HONOLULU, HAWAII.

CSR NO. 179

*Ralph Rosenberg* by EH
**Ralph Rosenberg Court Reporters, Inc.**
*1001 Bishop Street, Suite 2460, Honolulu, HI 96813*
*Phone: (808) 524-2090 Fax: (808) 524-2596*

REC'D MAY 1 3 2022

1          ACKNOWLEDGMENT OF DEPONENT

2          I, LOGAN WEBER, hereby certify that I have read the

3     foregoing typewritten pages 6 through 112, inclusive,

4     and corrections, if any, were noted by me, and the same

5     is now a true and correct transcript of my testimony.

6

7     DATED:  HONOLULU, HAWAII, __May 5, 2022_____.

8

9

10

11

12          __Logan Weber_____
                LOGAN WEBER
13

14    Signed before me this __5th_____

15    day of __May_____, 20 _22_ .

16

17    _____

18

19

20

21

22    Case:  Pacific Links., et al., v. Tianjin Dinghui

23    Hongjun
      Case No.: 21-00094
24    Deposition Dated: April 16, 2022
      Taken by:  Cassandra E. Ellis
25

REC'D MAY 1 3 2022

1     CERTIFICATE OF SHORTHAND REPORTER

2    I, Cassandra E. Ellis, Hawaii Certified Shorthand

3 Reporter, Registered Professional Reporter, Certified

4 Realtime Reporter, the officer before whom the foregoing

5 proceedings were taken, do hereby certify that the

6 foregoing transcript is a true and correct record of the

7 proceedings; that said proceedings were taken by me

8 stenographically and thereafter reduced to typewriting

9 under my supervision; and that I am neither counsel for,

10 related to, nor employed by any of the parties to this

11 case and have no interest, financial or otherwise, in

12 its outcome.

13    IN WITNESS WHEREOF, I have hereunto set my hand

14 this 22nd day of April 2022.

15

16

17

18

19

20

21 _____

22 CASSANDRA E. ELLIS, CSR-HI #475, CCR-WA #3484,

23 CSR-CA #14448, RPR #823848, CRR

24 REALTIME SYSTEMS ADMINISTRATOR

25