CASE LOMBARDI & PETTIT
A LAW CORPORATION

TED N. PETTIT                           4287
Email: tnp@caselombardi.com
MARK G. VALENCIA                        6783
Email: mgv@caselombardi.com
MICHELLE J. CHAPMAN                     9351
Email: mjc@caselombardi.com
MARIA AMPARO V. MCCORMICK               10623
Email: mav@caselombardi.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii  96813
Phone:  (808) 547-5400 | Fax:  (808) 523-1888

Attorneys for Defendant
Tianjin Dinghui Hongjun Equity Investment Partnership

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re:<br><br>PACIFIC LINKS U.S. HOLDINGS, INC., a Delaware Corporation,<br><br>Debtor. | Case No. 21-00094<br>(Chapter 11)<br>(Jointly Administered – Lead Case) |
| This Adversary Proceeding relates to:<br><br>ALL CASES | |
| PACIFIC LINKS US HOLDINGS, INC., et al.,<br><br>Plaintiffs<br><br>vs. | Adversary Proceeding No. 21-90009<br><br>**DEFENDANT TIANJIN DINGHUI HONGJUN EQUITY INVESTMENT PARTNERSHIP'S TRIAL BRIEF** |

TIANJIN DINGHUI HONGJUN
EQUITY INVESTMENT
PARTNERSHIP (LIMITED
PARTNERSHIP),

        Defendant.

## **TABLE OF CONTENTS**

I.    BACKGROUND .................................................................................1

II.   DISPUTED ISSUES OF LAW FOR TRIAL.....................................5

    A.    Plaintiffs Cannot Meet Their Burden of Proof at Trial to Show Insolvency ......................................................................5

        1.    Plaintiffs Cannot Show That They Each Were Insolvent Under The Balance Sheet Test.....................................7

        2.    Plaintiffs Cannot Show That They Each Were Insolvent Under The Unreasonably Small Capital Test ...........................18

        3.    Plaintiffs Do Not Argue And Cannot Show That They Were Each Insolvent Using The Cash Flow Test....................23

    B.    Good Faith Defense.............................................................26

III.  CONCLUSION..............................................................................27

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 172   Filed  06/13/22   Page 2 of 32

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Akers v. Koubourlis (In re Koubourlis)*,
   869 F.2d 1319 (9th Cir. 1989) ................................................................. 7

*Boyer v. Crown Stock Distribution, Inc.*,
   587 F.3d 787 (7th Cir. 2009) ........................................................... 17, 26

*EBC I., Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*,
   380 B.R. 348, (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F.
   App'x 135 (3d Cir. 2010) ................................................................. 24

*Frontier Bank v. Brown (In re N. Merch., Inc.)*,
   371 F.3d 1056 (9th Cir. 2004) .......................................................... 27

*Hawaii USA Fed. Credit Union v. Monalim*,
   147 Haw. 33, 464 P.3d 821 (2020) ..................................................... 10

*In re Bachrach Clothing, Inc.*,
   480 B.R. 820 (Bankr. N.D. Ill. 2012) .................................................. 22

*In re Bay Plastics, Inc.*,
   187 B.R. 315 (Bankr. C.D. Cal. 1995) .................................................. 6

*In re Bay Vista of Virginia, Inc.*,
   428 B.R. 197 (Bankr. E.D. Va. 2010) .................................................. 18

*In re DBSI Inc.*,
   593 B.R. 795 (Bankr. D. Idaho 2018) .................................................. 27

*In re Direct Access Partners, LLC*,
   602 B.R. 495 (Bankr. S.D.N.Y. 2019) .................................................. 25

*In re Doctors Hosp.*,
   360 B.R. at 870, F.2d 1056 (3d Cir.1992) ............................................ 18

*In re Emerging Commc'ns, Inc. S'holders Litig.*,
   2004 WL 1305745 (Del.Ch. June 4, 2004) ........................................... 23

*In re Flashcom, Inc.*,
   503 B.R. 99 (C.D. Cal. 2013) ........................................................... 10

*In re Fostvedt*,
   823 F.2d 305 (9th Cir. 1987) ........................................................... 16

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006) ............................................................ 27

*In re Imagine Fulfillment Servs., LLC*,
   489 B.R. 136 (Bankr. C.D. Cal. 2013) ................................................. 16

*In re Iridium Operating LLC*,
   373 B.R. 283 (Bankr. S.D.N.Y. 2007) ................................................... 7

*In re Lull*,
   386 B.R. 261 (Bankr. D. Haw. 2008) (*In re Maddalena*), 176 B.R. 551
   (Bankr.C.D.Cal.1995) ................................................................... 27

*In re Lyondell Chem. Co.*,
   567 B.R. 55 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018) .............. 19, 21

*In re Pringle*,
   495 B.R. 447 (B.A.P. 9th Cir. 2013) ..................................................... 5

*In re Roblin Indus., Inc.*,
   78 F.3d 30 (2d Cir.1996) ................................................................ 10

iii

*In re Ryan*,
    472 B.R. 714 (Bankr. E.D. Va. 2012) ............................................................... 10
*In re Seko Inv., Inc.*,
    156 F.3d 1005 (9th Cir. 1998) ........................................................................... 16
*In re Sierra Steel, Inc.*,
    96 B.R. 275 (B.A.P. 9th Cir. 1989) .................................................................... 16
*In re U.S. Invs. Co. of Am.*,
    4 F. App'x 541 (9th Cir. 2001) ....................................................................... 5, 6
*In re Wonderwork, Inc.*,
    611 B.R. 169 (Bankr. S.D.N.Y. 2020) ............................................................... 25
*Kim v. Kam*,
    128 Haw. 366 P.3d 1002 (Ct. App. 2012) ........................................................ 13
*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991) .............................................................................. 13
*Mizell v. Phillips*,
    240 F.2d 738 n. 2 (5th Cir.1957) ....................................................................... 10
*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir.1992) ........................................................................ 18, 19
*Paloian v. LaSalle Bank, N.A.*,
    619 F.3d 688 (7th Cir. 2010) ............................................................................. 12
*Peltz v. Hatten*,
    279 B.R. 710 (D.Del.2002) ........................................................................... 19, 22
*Shauer v. Alterton*,
    151 U.S. 607, 14 S.Ct. 442, 38 L.Ed. 286 (1894) .............................................. 27
*Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply, Inc.)*,
    228 B.R. 727 (9th Cir. BAP 1998) ...................................................................... 5
*WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy
    Corp.)*,
    282 B.R. 343 (Bankr. W.D. La. 2001) ................................................................ 24

**FEDERAL STATUTES**

11 U.S.C. § 101(32) ...................................................................................................... 7
11 U.S.C. § 101(32)(A) .................................................................................................. 7
11 U.S.C. § 548(a) .......................................................................................................... 6
11 U.S.C. § 548(a)(1)(B) ........................................................................................... 4, 5
11 U.S.C. § 548(a)(1)(B)(ii)(I) ...................................................................................... 7
11 U.S.C. § 548(a)(1)(B)(ii)(III) .................................................................................. 23

**STATE STATUTES**

Haw. Rev. Stat. § 651C-4(a)(2) .................................................................................... 4

**TABLES**

TABLE 1: Plaintiffs' Book Values as of December 2019 ............................................. 8
TABLE 2: Plaintiffs' Adjustments to Book values for 2022 Litigation ....................... 9
TABLE 3: *Illustration*: Recalculation of Table 2 Based on Legal Authorities ........... 15
TABLE 4: Unaccounted 2019 Receivables From Sale of Makaha Property Lots to Chinese
Investors ...................................................................................................................... 18

iv

## DEFENDANT TIANJIN DINGHUI HONGJUN
## EQUITY INVESTMENT PARTNERSHIP'S TRIAL BRIEF

Defendant TIANJIN DINGHUI HONGJUN EQUITY INVESTMENT PARTNERSHIP, by and through its attorneys, Case Lombardi & Pettit, A Law Corporation, respectfully submits its Trial Brief in accordance with this Court's [Dkt. 31] Scheduling Order, filed June 27, 2021.

The parties, by and through their respective counsel, have filed a Dkt. 167 Joint Statement of Glossary of Terms and Acronyms for Trial for the ease and convenience of the parties and the Court, which TDH hereby incorporates by reference.

## I.    BACKGROUND

This action arises from a December 2019 loan transaction that was initiated by Plaintiffs' ultimate beneficiary and owner, Du Sha, for the benefit of the Pacific Links golf network.  In 2019, Pacific Links held itself out as the world's most comprehensive reciprocal golf course network which served as the golf industry's leading portal to the avoid, travelling Chinese golfer.  Plaintiffs are special purpose entities within the Pacific Links network, consisting of a holding company (PLUSH), SARE entities (MGCW, MDRE, MDRE 2, MDRE 3, MDRE 4, and MDRE 5), and one entity that is responsible for the limited operations occurring at the Makaha Valley Country Club (MVCC).  Plaintiffs' primary business activities involved owning and developing the Makaha Property into a world-class golf

destination that was marketed to Pacific Links members in China. As of 2019, the Makaha Property development plans consisted of 30 10,000 square foot single family lots along the Makaha West Golf Course, 264 8,000 square foot single family lots, 200 5,000 square foot single family lots, 152 condo units with a lobby/recreation building, a Golf Clubhouse, Retail Village, and 2 champion golf courses designed by Tiger Woods and Gil Hanse.

In conducting loan diligence for the 2019 Loan, TDH learned that the Pacific Links related China entities, including TKB, to which TDH loaned money in 2017 and 2018 had transferred large amounts of money to Pacific Links North American entities, including Plaintiffs, to cover costs associated with real property ownership and development. This included over $20 million transferred from Pacific Links related China entities to Plaintiffs between 2017 and the first half of 2019 to pay Plaintiffs' other debts and development expenses for the Makaha Property.

TDH agreed to enter into the 2019 Loan with the understanding that Plaintiffs had benefitted from TDH's prior loans and would further benefit from the new loan transaction that Pacific Links requested to facilitate its immediate cash flow needs. The 2019 Loan involved paying off existing obligations under a 2017 entrusted loan in exchange for a new loan with new convertible loan terms, and extending deadlines under an existing 2018 convertible loan. Because regular funding from the Pacific Links related China entities was integral to Plaintiffs' business and necessary to

2

develop the Makaha Property, it was understood that this facilitation of cash flow would free up funds for Plaintiffs' continued operations and development of the Makaha Property, which development was projected to be a significant source of cash flow starting in 2020. Plaintiffs confirmed TDH's understanding and expressly represented that they "will receive substantial direct and indirect benefits" from the 2019 Loan.

The financial statements that Plaintiffs provided to TDH in connection with the 2019 Loan showed that Plaintiffs' assets exceeded their liabilities, and, while TKB was expected to pay the debt in full, should Plaintiffs and the other guarantors be called on to pay amounts due in the event of TKB's default, Plaintiffs' assets were more than sufficient to cover their share.

Unfortunately, the expectations of the parties at the time that they entered into the 2019 Loan were not fully realized due to the unforeseen global impacts of the COVID-19 pandemic. In this proceeding, Plaintiffs rely on hindsight and attempt to attribute the impacts of the COVID-19 pandemic to Plaintiffs' business and financial position at the time of the 2019 Loan. In doing so, the story that Plaintiffs would have this Court believe is directly contradicted by Plaintiffs' own representations at the time of the 2019 Loan.

Plaintiffs ask this Court to enter a judgment that would avoid their obligations and transfers to TDH in connection with the 2019 Loan as allegedly fraudulent under

3

Haw. Rev. Stat. § 651C-4(a)(2) and 11 U.S.C. § 548(a)(1)(B). Plaintiffs allege nine claims in this regard as follows:

| Count | Obligation / Transfer Plaintiff(s) Want to Avoid | Applicable Plaintiff(s) |
|-------|--------------------------------------------------|-------------------------|
| Count I | Framework Agreement | All |
| Count II | Secured Guaranty | All |
| Count III | Hawaii MVCC Mortgage | Hawaii MVCC |
| Count IV | Hawaii MGCW Mortgage | Hawaii MGCW |
| Count V | MDRE Mortgage | MDRE |
| Count VI | MDRE 2 Mortgage | MDRE 2 |
| Count VII | MDRE 4 Mortgage | MDRE 4 |
| Count VIII | MDRE 5 Mortgage | MDRE 5 |
| Count IX | PLUSH Pledge Agreement | PLUSH |

At trial, Plaintiffs each bear the burden to prove by a preponderance of the evidence that they each were insolvent at the time of, or rendered insolvent by, their obligations and/or transfers in connection with the 2019 Loan.

Plaintiffs cannot meet their burden of proof by relying on the bald assertions of Harry Chang whose testimony is contradicted by Plaintiffs' own representations at the time of the 2019 Loan. Plaintiffs' prior representations constitute admissions against interest that cannot be overcome by mere unsupported self-serving litigation-driven statements to the contrary. Nor can Plaintiffs meet their burden of proof by relying on purported expert opinions that reflect clear omissions, unfounded assertions, hindsight bias, deviations from accepted methodology, and flagrant manipulations of Plaintiffs' financial data to reach Plaintiffs' desired result. Such improper opinions are unreliable and inadmissible.

4

## II.  DISPUTED ISSUES OF LAW FOR TRIAL

Plaintiffs each bear the burden of proof at trial to establish all of the elements of their fraudulent transfer claims relating to each of their individual obligations and transfers that they seek to avoid.  *In re U.S. Invs. Co. of Am.*, 4 F. App'x 541, 542 (9th Cir. 2001).  The party seeking avoidance under § 548(a)(1)(B) must show that the transfer or obligation: (1) involved property of the debtor; (2) was made within two years of the petition; (3) was not exchanged for reasonably equivalent value; and (4) occurred when the debtor was insolvent, or made the debtor insolvent.  *In re Pringle*, 495 B.R. 447, 462–63 (B.A.P. 9th Cir. 2013) (citing *Spear v. Global Forest Prods. (In re Heddings Lumber & Bldg. Supply, Inc.),* 228 B.R. 727, 729 (9th Cir. BAP 1998)).

Elements 1 and 2 are not in dispute.  Element 3 was resolved prior to trial by the Court's [Dkt. 133] Memorandum Decision, entered May 4, 2022 and thereby removed from the field of controversy for trial.  Thus, the issue remaining for trial centers on element 4.

### A.  Plaintiffs Cannot Meet Their Burden of Proof at Trial to Show Insolvency

There are three kinds of financial distress that may support a fraudulent transfer claim, *i.e.*, where a transfer or obligation: (a) was made while a debtor was insolvent or rendered a debtor insolvent (the "**Balance Sheet**" test); (b) left a debtor undercapitalized or nearly insolvent (*i.e.*, with insufficient assets to carry on

5

its business) (the "**Unreasonably Small Capital**" test); and (c) was made or undertaken by a debtor that intended thereby to incur debts beyond its ability to pay (the "**Cash Flow**" test). 11 U.S.C. § 548(a); *In re Bay Plastics, Inc.*, 187 B.R. 315, 322–23 (Bankr. C.D. Cal. 1995).

Under section 548, insolvency is to be measured at the time the debtor transferred value or incurred the obligation. *In re U.S. Invs. Co. of Am.*, 4 F. App'x 541, 542 (9th Cir. 2001). In this case, Plaintiffs' obligations under the Framework Agreement, the Secured Guaranty, and the PLUSH Pledge Agreement were incurred on December 11, 2019. Plaintiffs' Mortgages are dated December 11, 2019 and were recorded at later dates between March and April 2020,[1] however, Plaintiffs' proffered expert report indicates that there was no change in Plaintiffs' finances between December 11, 2019 and the various recording dates of the Mortgages.

Plaintiffs lack sufficient competent evidence to meet their burden of proof at trial. As discussed in detail below, Plaintiffs' proffered expert opinions regarding Plaintiffs' insolvency under all 3 tests deviate from well-established standards, omit required considerations and facts, and are riddled with hindsight bias to achieve Plaintiffs' desired result, which renders the purported expert's opinions unreliable

---

[1] For purposes of Section 548, "a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee[.]" § 548(d)(1).

6

and inadmissible. "Expert's disregard for methodology advocated by valuation authorities and typical practice in investment banking and academia shows that his opinions respecting debtor's solvency and adequacy of capitalization, in the context of fraudulent and preferential transfer claims, are not the product of reliable principles and methods for purposes of determining admissibility of expert's testimony." *In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007). "Expert's failure to look at facts, even for a reality check, means that expert lacks sufficient facts, and renders his opinion unreliable and thus inadmissible." *Id.* The "Court should exclude expert valuation testimony if the expert bases his analysis on an inappropriate set of cash flow projections, did not consider market values, and cannot explain the unreasonable implications of his analysis." *Id.*

### 1. Plaintiffs Cannot Show That They Each Were Insolvent Under The Balance Sheet Test

Debtor is insolvent when its debts exceed its assets — the "traditional bankruptcy balance sheet test." *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir. 1989). The Balance Sheet Test is codified at § 101(32)(A), which defines insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation[.]" Thus, for purposes of § 548(a)(1)(B)(ii)(I), insolvency is determined using a "balance sheet test." *In re Koubourlis*, 869 F.2d at 1321. Application of the Balance Sheet Test under the plain language of § 548(a)(1)(B)(ii)(I) and 101(32), requires the Court to

7

assign a value to Plaintiffs' assets and liabilities and then determine whether the value of Plaintiffs' respective assets exceed their respective liabilities.

As of December 2019, Plaintiffs reported on their tax returns total assets and liabilities in the following amounts:

**TABLE 1: Plaintiffs' Book Values as of December 2019**

| Plaintiff | Reported Assets | Reported Liabilities | Net Total Assets - Liabilities |
|---|---|---|---|
| PLUSH | $96,270,193 | $11,844,924 | $84,425,269 |
| MVCC | $5,904,068 | $48,097 | $5,855,971 |
| MGCW | $12,962,853 | $53,564 | $12,909,289 |
| MDRE | $7,083,783 | $497,554 | $6,586,229 |
| MDRE 2 | $2,219,107 | $0 | $2,219,107 |
| MDRE 3 | $4,272,032 | $3,780,000 | $492,032 |
| MDRE 4 | $2,665,920 | $2,142,857 | $523,063 |
| MDRE 5 | ($4,282) | $0 | ($4,282) |
| Combined Totals | $176,521,996 | $18,245,466 | $158,276,530 |

Plaintiffs' tax returns did not reflect the 2019 Loan contingent debt as a liability for any of the Plaintiffs. Indeed, as of December 2019, no amount was due on the 2019 Loan. Plaintiffs' obligations to pay any amount in connection with the 2019 Loan were uncertain and contingent on events that had not yet occurred (*i.e.*, TKB's default on scheduled payment deadlines and TDH's calling on Plaintiffs to pay). Further, according to Mr. Du, as of the 2019 Loan TKB was not expected to default on any payments and, in fact, would not have defaulted were it not for the COVID-19 pandemic.

8

In an effort to skew the book values to manufacture the appearance that all Plaintiffs were insolvent, Plaintiffs proffer the purported expert opinions of Duane Seabolt who, based on unsupported representations from Mr. Chang and dubious accounting, made sweeping adjustments to Plaintiffs' financial records to arrive at the following calculations:

**TABLE 2: Plaintiffs' Adjustments to Book values for 2022 Litigation** [2]

| Plaintiff | Seabolt Adjusted Assets | Seabolt Adjusted Liabilities | Seabolt Adjusted Net Total Assets - Liabilities |
|---|---|---|---|
| PLUSH | $19,367 | $57,444,000 | ($57,424,633) |
| MVCC | $9,190,751 | $57,492,097 | ($48,301,346) |
| MGCW | $9,155,378 | $57,497,564 | ($48,342,186) |
| MDRE | $5,025,201 | $57,963,046 | ($52,937,845) |
| MDRE 2 | $4,525,901 | $57,444,000 | ($52,918,099) |
| MDRE 3 | $2,309,499 | $61,224,000 | ($58,914,501) |
| MDRE 4 | $5,179,200 | $59,586,857 | ($54,407,657) |
| MDRE 5 | $500 | $57,444,000 | ($57,443,500) |
| Combined Totals | $35,405,797 | $466,095,564 | ($430,689,767) |

By applying improper adjustments, Mr. Seabolt reduced Plaintiffs' combined total assets by over $140 million and increased Plaintiffs' combined total liabilities by over $447 million. The flaws in this tortured accounting are glaring.

**First**, Plaintiffs have no competent evidence to support their retroactive reductions to the 2019 reported assets and the book values should control. When evaluating insolvency, assets are determined using fair market value. *In re Ryan*,

---

[2] P-78, Schedules 2-8.

472 B.R. 714, 727 (Bankr. E.D. Va. 2012) (the balance sheet test involves the comparing of the fair market value of the debtor's assets at the time of the transaction with the debtor's liabilities on the same date). Hawaii courts have previously recognized that "[t]he reliance . . . on the tax-assessed value of the Property to demonstrate market value does not recognize the <u>longstanding and 'overwhelming weight of authority that assessed value is not competent direct evidence of value for purposes other than taxation.</u>'" *Hawaii USA Fed. Credit Union v. Monalim*, 147 Haw. 33, 52, 464 P.3d 821, 840 (2020) (emphasis added). On the other hand, courts do recognize that book value may be considered as competent evidence from which a court may draw inferences about a debtor's solvency. *See In re Roblin Indus., Inc.,* 78 F.3d 30, 36 (2d Cir.1996) (citation omitted). Thus, unlike tax assessed value, while "[b]ook value does not necessarily prove fair market value, <u>[it] is competent evidence</u>." *In re Flashcom, Inc.*, 503 B.R. 99, 123 (C.D. Cal. 2013) (emphasis added) (citing *Mizell v. Phillips,* 240 F.2d 738, 741 n. 2 (5th Cir.1957)).[3]

---

[3] Distress property value is less than fair market value. *See Hous. Fin. & Dev. Corp. v. Harold K.L. Castle Found.*, 79 Haw. 321, 901 P.2d 1300 (Ct. App. 1995) ("fair market value" defined as "that amount of money that a purchaser willing, but not obliged, to buy an interest in land would pay an owner willing, but not obliged, to sell it, taking into consideration all uses to which the land is adapted or might in reason be applied"); *In re Petersen*, 42 B.R. 42, 43 (Bankr. D. Or. 1984) (Distress sales can be suggested not only by lower prices but by lower acceptable down payments and interest rates resulting in a higher sales price).

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 172   Filed  06/13/22   Page 14 of 32

In this case, Plaintiffs assert that they purchased the Makaha Property between 2011 and 2015 for a total acquisition cost of $35 million and that they thereafter invested another $15 million into its development. Plaintiffs' book values for the Makaha Property reflect value added since acquisition through development work, including improvements, infrastructure, and land entitlements. Plaintiffs' reliance on tax assessed value to assert that the Makaha Property as a whole did not increase in value whatsoever is misleading and only underscores that tax assessed values are not competent evidence of fair market value.

**<u>Second</u>**, Mr. Seabolt grossly inflated liabilities arising from the 2019 Loan by reflecting the full debt (plus some due to Mr. Seabolt's incorrect RMB to USD conversion) to each and every Plaintiff, without any reduction for pro rata shares among all joint and several obligors or offset for contribution rights. According to Mr. Seabolt's adjusted liabilities, under the 2019 Loan Plaintiffs collectively incurred liabilities totaling $459,552,000 (*i.e.*, $57,444,000[4] x 8 Plaintiffs). This is absurd. There is no scenario under which each and every one of the Plaintiffs would have had to pay the entire amount of the debt under the 2019 Loan. If one of the Plaintiffs paid the full amount due, the debt would be reduced to $0 for all, and the Plaintiff that paid the full amount of the debt will then have a claim for contribution

---

[4] Mr. Seabolt's calculations reflecting debt of $57,444,000 are incorrect. The subject debt converted from RMB to U.S. Dollars was $56,812,800, not $57,444,000.

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 172   Filed  06/13/22   Page 15 of 32

from the other co-obligors for their share.[5]  Any attempt to justify such an inflated figure based on arguments that the joint and several nature of the obligation warrants multiplication of the debt times 8 is undermined by Plaintiffs' own accounting of MDRE 3 and MDRE 4's joint and several liability on Towne Note 1 and Towne Note 2 (*i.e.*, allocating the debt in part to MDRE 3 ($3,780,000) and MDRE 4 ($2,142,857) and not duplicating the full debt ($5,922,857) on the accounts for both entities).

The Seventh Circuit in *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010) established what is required in valuing the debtor's assets and liabilities where joint and several liabilities exist.  At issue in *Paloian* was the proper method to value an $18.5 million liability of the debtor hospital, which was owned and controlled by James Desnick, for submitting excessive claims for Medicare and Medicaid payments. *Id.* at 689, 693.  The Court of Appeals rejected the bankruptcy court's insolvency determination, finding a "**<u>glaring error</u>**" in the court's failure to include the value of the hospital's contribution claim against Desnick as an asset of the hospital in the insolvency equation. *Id.* at 693 (emphasis added).  In holding that "**<u>contingent liabilities must be matched against contingent assets</u>**" the Court of Appeals explained:

---

[5] The value of the contribution claim is real given that other guarantors own assets in China valued at RMB 1.5 billion ($220 million), according to Mr. Du's testimony.

The missing asset was Desnick's wealth. If Desnick caused the hospital to submit excessive claims for federal payments, then he and the Hospital were jointly and severally liable for restitution. So if $18.5 million goes on the liability side of the Hospital's balance sheet, the asset side must contain an estimate (as of [the date the allegedly fraudulent transfers began]) of how much Desnick would chip in, either directly or via contribution or indemnity (for, if the Hospital paid, then it would have a claim against Desnick).

*Id.* Similarly, the Third Circuit in *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991) held that:

In valuing the cost of [the debtor's] guaranty, **the right of contribution from co-guarantors needs to be balanced against the amount of debt for which [the debtor] is liable**. Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy,* 60 Amer.Bank.L.J. 109, 114 (1986) ("If there are multiple guarantors of the same obligation, the right of contribution entitles a paying guarantor to have its co-guarantors pay it their proportionate share of the principal debt it paid.") Thus, the value of the guaranty . . . must be reduced to the extent contribution was available at the time of the loan from [the debtor's] co-guarantors.

*Id.* at 648 (emphasis added). The Court of Appeals held that a determination of the debtor's insolvency could not be made in the absence of proof of, among other things, the value of the debtor's right to contribution. *Id.* at 649.

Hawaii law also recognizes that a right to contribution arises when, as between multiple parties jointly bound to pay a sum of money, one party is compelled to pay more than his share. *Kim v. Kam*, 128 Haw. 366, 289 P.3d 1002 (Ct. App. 2012). That party may then assert a right of contribution against the others for their proportionate share of the common obligation. *Id.*

13

In this case, there are twelve co-obligors on the $56,812,800.00 debt: TKB, Plaintiffs, PLIC, Du Sha and Du Ran.[6] Plaintiffs provide no evidence or argument to support any specific proportional allocations of the debt amongst the 12 obligors, therefore, in accordance with the foregoing authorities, proper analysis would require at least allocation of the debt on a pro-rata basis[7] or accounting for contribution offsets from the 11 other co-obligors.[8] Pro rata allocation appears to be Plaintiffs' preferred method (over contribution offsets) based on Plaintiffs' treatment of the joint and several liability under Towne Note 1 and Towne Note 2.

Even if we accept Mr. Seabolt's adjustments to Plaintiffs' accounts for which there was allegedly no reasonable expectation of payment (according to Mr. Chang), properly allocating the 2019 Loan debt across all 12 co-obligors materially changes the outcome of the calculations.

---

[6] The following individuals and companies provided additional security for the debt as Pledgors: Pacific Links (Asia) Holding Co., Limited; Zhao Xueming; Pacific Links Golf Development Co., Limited; Sun Ling; Jiao Ruojun; and Beijing Global Sports Leisure Club Co., Ltd. For purposes of this trial brief and simplicity, illustrative calculations are based on the 12 joint and several obligors under the 2019 Loan, not counting for liability shared by/contribution recoverable from the additional Pledgors.

[7] **Pro rata calculation**: $56,812,800 total debt ÷ 12 total obligors = $4,734,400 liability per obligor.

[8] **Contingent debt/asset calculation**: $56,812,800 total debt as contingent liability - $52,078,400 contribution claim as contingent asset = $4,734,400 net contingent liability (not counting for discount due to contingent nature of liability).

14

For example and illustration purposes only:

**TABLE 3: *Illustration*: Recalculation of Table 2 Based on Legal Authorities**

| Plaintiff | Seabolt Adjusted Assets *except* reversing adjustments to tax assessed value back to book value[9] | Seabolt Adjusted Liabilities *except* reversing adjustments to add $57,444,000 liability for each Plaintiff and adding instead pro rata (1/12th) share of $56,812,800[10] | Recalculated Net Total Assets - Liabilities |
|---|---|---|---|
| PLUSH | $19,367 | $4,734,400 | ($4,715,033) |
| MVCC | $5,303,067 | $4,782,497 | $520,570 |
| MGCW | $7,172,260 | $4,787,964 | $2,384,296 |
| MDRE | $20,371,401 | $5,253,446 | $15,117,955 |
| MDRE 2 | $5,118,109 | $4,734,400 | $208,499 |
| MDRE 3 | $4,498,296 | $8,514,400 | ($4,016,104) |
| MDRE 4 | $6,545,175 | $6,877,257 | ($332,082) |
| MDRE 5 | $225,838 | $4,734,400 | ($4,508,562) |
| Combined Totals | $49,253,513 | $44,418,764 | $4,659,449 |

**Third**, Mr. Seabolt's analysis is defective in that it fails to discount Plaintiffs' contingent liability by the probability that the contingency will occur and the liability will become real as of December 11, 2019. For purposes of the insolvency test, if there is a contingent asset or contingent liability, that asset or liability must be

---

[9] Book value is competent evidence of fair market value; tax assessed value is not. *In re Flashcom, Inc.*, 503 B.R. 99, 123 (C.D. Cal. 2013); *Hawaii USA Fed. Credit Union v. Monalim*, 147 Haw. 33, 52, 464 P.3d 821, 840 (2020).

[10] Right to contribution from co-obligors arises where one party pays more than its share of the common obligation. *Kim v. Kam*, 128 Haw. 366, 289 P.3d 1002 (Ct. App. 2012); *see also Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991).

15

reduced to its present, or expected value. *In re Imagine Fulfillment Servs., LLC*, 489 B.R. 136, 146 (Bankr. C.D. Cal. 2013) (citations omitted).

On December 11, 2019, Plaintiffs' obligations to pay any amount under the Secured Guaranty were contingent on a future and uncertain event, namely that TKB would default and Plaintiffs would be called on to pay whatever amount TKB failed to pay. *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) (a contingent debt is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor."); *In re Seko Inv., Inc.*, 156 F.3d 1005, 1008 (9th Cir. 1998) ("Claims are contingent as to liability when the debtor's duty to pay arises only upon the occurrence of a future event that was contemplated by the parties at the time of the contract's execution").

Given that Plaintiffs' obligation to pay was contingent, Mr. Seabolt should have reduced it to its expected value by discounting it by the probability that the contingency will occur and the liability will become real as of December 11, 2019. *In re Sierra Steel, Inc.*, 96 B.R. 275 (B.A.P. 9th Cir. 1989). In December 2019, there was no indication that TKB would default under the terms of the 2019 Loan. In particular, Mr. Du testified that "[i]f it wouldn't be the COVID-19, there wouldn't be any issue" to re-pay the loans to TDH. In failing to discount Plaintiffs' debt to its expected value as of December 11, 2019, Mr. Seabolt completely ignored the

16

contingent aspect of Plaintiffs' liability under the Secured Guaranty. Instead, Mr. Seabolt incorrectly used selective hindsight and added an inflated $57 million to the liabilities of each of the Plaintiffs. Hindsight bias, however, is to be fought and not embraced. *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009).

In sum, the purported evidence proffered by Plaintiffs in this case is riddled with hindsight bias, selective omissions and improper deviations from established standards and considerations required under the Balance Sheet test.  Mr. Seabolt's opinions, which applied faulty methodology to arrive at Plaintiffs' desired result, are unreliable and consequently inadmissible.  Plaintiffs cannot meet their burden to prove insolvency using the Balance Sheet Test.

### a) Plaintiffs' Financial Records Omit Accounts Receivable For Sales Relating to Future Lots to be Developed on the Makaha Property

In 2019, Chinese investors purchased interests in certain future lots to be developed on the Makaha Property by December 2021.  Over $5 million total sales proceeds were generated in connection with the sale of these interests in the Makaha Property.  The identified lots are located on properties owned by MGCW, MDRE, MDRE 2 and MDRE 4, and the distribution of proceeds for the sale of interests in these lots is summarized in the table below.

17

**TABLE 4:** **Unaccounted 2019 Receivables From Sale of Makaha Property Lots to Chinese Investors**

| Plaintiff | Accounts Receivable From Sale of Interests in Lots to Chinese Investors | Amount of Receivables in USD |
|---|---|---|
| MGCW | RMB 3,580,000 | $508,474 |
| MDRE | RMB 8,598,233 | $1,221,224 |
| MDRE 2 | RMB 1,400,000 | $198,844 |
| MDRE 4 | RMB 14,586,980 | $2,071,817 |

Although, according to Plaintiffs, the sale proceeds were collected by another Pacific Links entity, the amounts should have been considered accounts receivable assets on Plaintiffs' financial records. Plaintiffs' ultimate owner and beneficiary, Mr. Du, agreed, testifying that the companies that own the golf courses should be the "beneficiary or received the benefits of the proceeds of the sales of memberships."

## 2. Plaintiffs Cannot Show That They Each Were Insolvent Under The Unreasonably Small Capital Test

Neither the Bankruptcy Code nor the Uniform Fraudulent Conveyance Act ("UFCA") defines the term "unreasonably small capital." *In re Bay Vista of Virginia, Inc.*, 428 B.R. 197, 225 (Bankr. E.D. Va. 2010). Courts have held, however, that "an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations." *In re Doctors Hosp.,* 360 B.R. at 870, quoting *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1070 (3d Cir.1992).

18

"The proper test is objective: the court should ask whether the parties' projections regarding the ability to sustain operations were reasonable." *Id.*, quoting *Moody,* 971 F.2d at 1073 (emphasis added). So long as those projections were reasonable at the time they were made, they will not be rejected simply because they were ultimately proven wrong. *Moody,* 971 F.2d at 1074. Additionally, "the test for unreasonably small 'capital' should include ... **all reasonably anticipated sources of operating funds**, which may include new **equity infusions**, **cash from operations**, or cash from secured or unsecured loans over the relevant time period." *Peltz v. Hatten,* 279 B.R. 710, 745 (D.Del.2002) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1072 n. 24 (3d Cir.1992) (emphasis added). "A central consideration when determining whether a transaction leaves a company with unreasonably small capital, for constructive fraudulent transfer avoidance purposes, is whether the parties' **projections** used in facilitating the transaction were reasonable; **courts will compare a company's projected cash inflows**, also referred to as working capital or operating funds, with the company's capital needs throughout a reasonable period of time after the questioned transfer." *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017), aff'd, 585 B.R. 41 (S.D.N.Y. 2018).

There is no dispute that since Plaintiffs' inception Plaintiffs routinely received cash transfers and/or equity infusions from Pacific Links related China entities

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 172   Filed   06/13/22   Page 23 of 32

(including TKB) to fund Plaintiffs' budgeted expenditures, including the development of the Makaha Property. Over the years, Plaintiffs received approximately $149 million from Pacific Links related China entities. At the time of the 2019 Loan, it was reasonable to believe and it was believed that this established routine would continue, especially after TDH agreed to facilitate cash flow for the Pacific Links entities via the 2019 Loan, from which Plaintiffs expressly represented they would receive substantial direct and indirect benefits. Now, however, Plaintiffs proffer inadmissible hearsay (Chang Dec. ¶122) to assert that as of the 2019 Loan they understood that the Pacific Links related China entities would deviate from established historical norms. This inadmissible hearsay must be disregarded. Moreover, even if true, the alleged shortfall in funds to cover budgeted expenditures does not equate to insufficient cash to sustain operations. Plaintiffs (consisting of a holding company, 6 SARE entities, and an entity with limited operations relative to the Makaha Valley Country Club) had minimal operations. The budgeted expenditures includes desired activity/wish-list items that were not necessary to operations. In fact, Logan Weber testified that through operational improvements, Plaintiffs were able to change their financial position to the point of making profit.

For their Unreasonably Small Capital test, Plaintiffs also rely on the purported expert opinions of Mr. Seabolt, which is deficient in that he failed, among other

things, to: (i) consider Plaintiffs' projected cash inflows; (ii) account for consistent and regular equity infusions from Pacific Links related China entities; and (iii) adequately assess the actual needed working capital to sustain Plaintiffs' operations.

The failure to consider Plaintiffs' projected cash inflows is the most glaring omission from Mr. Seabolt's analyses. Projected cash inflows is a "central consideration" when determining whether a transaction leaves a company with unreasonably small capital. *See In re Lyondell Chem. Co.* at 567 B.R. 55. It is central because "courts will compare a company's projected cash inflows, also referred to as working capital or operating funds, with the company's capital needs throughout a reasonable period of time after the questioned transfer." *Id*. The Plaintiffs' projected cash inflows relative to development of the Makaha Property estimate $539,120,583 gross profit from 2019 through 2026. Mr. Seabolt wholly ignored the projected profitability of the Makaha development.

In addition to Plaintiffs' own projections showing that the development of the Makaha Property was going to yield significant sales revenues beginning in 2020, Plaintiffs' former controller, Logan Weber, testified that Plaintiffs expected their revenues to increase in 2020 based on Plaintiffs' revenue initiatives for the golf course outlined in a Sales Program.

Furthermore, Mr. Seabolt's opinions are defective and unreliable due to the failure to consider "all reasonably **anticipated** sources of operating funds, which

U.S. Bankruptcy Court - Hawaii  #21-90009  Dkt # 172  Filed  06/13/22  Page 25 of 32

include **new equity infusions**, cash from operations, or cash form secured or unsecured loans[.]" *Peltz v. Hatten,* 279 B.R. 710, 745 (D.Del.2002) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1072 n. 24 (3d Cir.1992) (emphasis added).  Mr. Seabolt acknowledges that all Plaintiff subsidiary companies were reliant on monthly capital infusions from parent companies and/or affiliates to meet operating expenses, however, the Schedules and analyses fail to factor in this consistent reliable source of operating funds from Pacific Links related China entities.  *See In re Bachrach Clothing, Inc.*, 480 B.R. 820, 874-76 (Bankr. N.D. Ill. 2012) (debtor was not left with unreasonably small capital given belief of management and others as to the reasonableness of contemporaneous projections, lenders' reliance on projections in providing substantial credit, **and owner's financial ability to contribute capital and its exhibited willingness to do so**).

In this case, Mr. Du, testified that the Pacific Links entities in China, including TKB, were very successful and sales revenues generated year after year were only "getting better and better." According to Mr. Du, had COVID-19 not occurred, TKB would have had no issues re-paying the debt to TDH. TDH waived its rights under the 2017 entrusted loan and prior terms of the 2018 convertible loan, and extended the new convertible loan in 2019 in reliance on Mr. Du's representations regarding the future of Pacific Links as well as Plaintiffs' representations and disclosures in connection with loan diligence for the 2019 Loan (*e.g.*, showing that Plaintiffs were

22

solvent). Lastly, Mr. Du and the other Pacific Links entities routinely transferred capital infusions to Plaintiffs which historical norm was expected to continue as of the 2019 Loan. Each of these facts weighs against Plaintiffs and supports the determination that Plaintiffs cannot meet their burden of proof at trial to prove that the companies are insolvent using the Unreasonably Small Capital Test.

Mr. Seabolt essentially conducted an abbreviated balance sheet analysis in lieu of a proper Unreasonably Small Capital Test and arrived at faulty conclusions driven by hindsight bias and other cognitive distortions that do not comport with the projections and beliefs of Plaintiffs at the time of the 2019 Loan. *See In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *15 (Del.Ch. June 4, 2004) (noting that "*post hoc* litigation-driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions.'") (citations omitted). Proper consideration of Plaintiffs' projections and reasonable expectations of the parties as of the 2019 Loan supports a finding that Plaintiffs' total potential sources of prospective operating capital was sufficient to meet the minimal required operating capital needed for Plaintiffs to sustain their very limited operations.

### 3. Plaintiffs Do Not Argue And Cannot Show That They Were Each Insolvent Using The Cash Flow Test

Plaintiffs have submitted no admissible evidence or testimony to show that they each "intended to incur or believed that it would incur debts beyond its ability to pay as they came due," § 548(a)(1)(B)(ii)(III), and as such, have waived this

argument for trial. Indeed, no argument under the Cash Flow Test would be appropriate under the circumstances here because "[t]his part of the statute protects future creditors from a debtor who transfers assets with the intent to hide them or impair the debtor's ability to pay debts as they arise or with the belief that inability to pay debts would likely result." *WRT Creditors Liquidation Tr. v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001). This prong is satisfied "if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *Id.* at 415; *see EBC I., Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del. 2008), *aff'd*, 400 B.R. 13 (D. Del. 2009), *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (same). "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured." 5 COLLIER ON BANKRUPTCY at ¶ 548.05[3][c] (citing cases).

Notwithstanding the lack of competent evidence or testimony as to intent, Mr. Seabolt purports to opine on insolvency under the Cash Flow test. Mr. Seabolt applies the same defective analysis for each of the Plaintiffs.

24

It would be disingenuous for Plaintiffs to claim that they entered into the 2019 Loan with the intent or belief that subsequent creditors likely would not be paid, because the probability that Plaintiffs would be called upon to pay the debt as of December 2019 was remote. In fact, Plaintiffs were not called on to pay any amount in connection with the 2019 Loan until November 2020. At the time of the 2019 Loan, TKB was expected to continue its success and generate sufficient revenue to pay the debt in full. This expectation was not realized due to the unforeseen impacts of COVID-19. But for COVID-19, TKB would have had no issue re-paying the loan to TDH. *In re Wonderwork, Inc.*, 611 B.R. 169, 212 (Bankr. S.D.N.Y. 2020) (the "ability to pay" financial test requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity); *In re Direct Access Partners, LLC*, 602 B.R. 495 (Bankr. S.D.N.Y. 2019) (challenged payments were not made at a time when debtor intended to incur, or believed it would incur, debts that would be beyond its ability to pay as they matured, where chairman of debtor believed that debtor was doing well financially and that all payments that it made were well within its financial means, and debtor was current on its obligations and did not have major creditors at the time of challenged payments). The facts and circumstances surrounding the 2019 Loan do not support a finding of insolvency under the Cash Flow Test.

25

In addition to material deficiencies, the hindsight bias evident in Mr. Seabolt's analyses relative to the Cash Flow Test, including applying retrospective financial data, not financial data and expectations as of December 11, 2019, renders Mr. Seabolt's opinions improper and inadmissible. Hindsight bias, however, is to be fought and not embraced. *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009).

## B.    <u>Good Faith Defense</u>

To the extent that any of the Plaintiffs may satisfy their burden of proof at trial on the element of insolvency, TDH hereby asserts a good faith defense pursuant to Section 548(c), which provides that:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or <u>may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation</u>.

Section 548(d)(2)(A) states that "value means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."

"Value" includes "any benefit" to the debtor "direct or indirect." The mere opportunity to receive an economic benefit in the future constitutes "value" under the Bankruptcy Code. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir.

26

2006).  "Value" can be provided either directly or indirectly.  *See, e.g., Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004).

In this case, TDH acted in good faith with respect to the 2019 Loan.  TDH agreed to the 2019 Loan based on the representations of Mr. Du, including regarding the expected continued success of the Pacific Links entities and TKB's ability to repay the debt, and the representations of Plaintiffs, including regarding Plaintiffs' financial condition (*i.e.*, solvent) and role within Pacific Links supporting their representations that they would receive substantial direct and indirect benefits from the 2019 Loan (consistent with historical patterns of intercompany transfers). *Shauer v. Alterton,* 151 U.S. 607, 621, 14 S.Ct. 442, 38 L.Ed. 286 (1894) (discussing good faith); *In re Lull*, 386 B.R. 261, 271 (Bankr. D. Haw. 2008) (citing *Gill v. Maddalena* (*In re Maddalena*), 176 B.R. 551, 556 (Bankr.C.D.Cal.1995)) (same).

TDH also provided various forms of value, totaling $80,729,224, to Plaintiffs in connection with the 2019 Loan. Value is determined as of the time the transferred occurred. *In re DBSI Inc.*, 593 B.R. 795, 829 (Bankr. D. Idaho 2018).  Accordingly, even if a couple of the Plaintiffs can show that they were insolvent, TDH should be entitled to retain its claims up to $80,729,224.

## III.  **CONCLUSION**

Based on the foregoing, it is clear that not all Plaintiffs can meet their burden of proof at trial on the element of insolvency.  *See discussion supra, e.g.*, <u>Table 1</u> (if

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 172   Filed  06/13/22   Page 31 of 32

based on Plaintiffs' 2019 book values, all Plaintiffs except MDRE 5 were solvent); Table 3 (if based on Plaintiffs' proffered expert's adjustments excluding adjustments that violate accepted methodologies and legal authorities, MVCC, MGCW, MDRE, and MDRE 2 were solvent) and Table 4 (building on Table 3, if omitted accounts receivable properly added to assets, MVCC, MGCW, MDRE, MDRE 2 and MDRE 4 were solvent).

For each of the Plaintiffs that fail to demonstrate their insolvency, their claims fail as a matter of law.

For the foregoing reasons, and those to be shown at trial, TDH respectfully submits that judgment should be granted in its favor with respect to all claims raised against it in Plaintiffs' Complaint.

DATED:    Honolulu, Hawaii, June 13, 2022.

<div style="margin-left: 40%">

*/s/ Maria Amparo V. McCormick*
TED N. PETTIT
MARK G. VALENCIA
MICHELLE J. CHAPMAN
MARIA AMPARO V. MCCORMICK
Attorneys for Defendant
TIANJIN DINGHUI HONGJUN EQUITY
INVESTMENT PARTNERSHIP

</div>