

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 21-00094 |
| | Chapter 11 |
| PACIFIC LINKS U.S. HOLDINGS, INC., a Delaware corporation, | (Jointly Administered – Lead Case) |
| Debtor. | |
| This Adversary Proceeding relates to: | |
| ALL CASES | |
| PACIFIC LINKS U.S. HOLDINGS, INC., et al. | Adv. Pro. No. 21-90009 |
| Plaintiffs, vs. | |
| TIANJIN DINGHUI HONGJUN EQUITY INVESTMENT PARTNERSHIP (LIMITED PARTNERSHIP), | |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON FRAUDULENT TRANSFER CLAIMS

The plaintiffs in this adversary proceeding – Pacific Links U.S. Holdings, Inc. ("PLUSH"); Hawaii MVCC LLC ("MVCC"); Hawaii MGCW LLC ("MGCW"); MDRE LLC ("MDRE"); MDRE 2 LLC ("MDRE 2"); MDRE 3 LLC ("MDRE 3"); MDRE 4 LLC ("MDRE 4"); and MDRE 5 LLC ("MDRE 5") (collectively "Debtors") – are debtors in possession in jointly administered chapter 11 bankruptcy cases before this court. They initiated this adversary proceeding to avoid obligations and transfers in favor of the defendant Tianjin Dinghui Hongjun Equity Investment Partnership ("TDH"). The Debtors allege that the obligations and transfers are constructively fraudulent under the Bankruptcy Code and Hawaii state law.

The trial of this adversary proceeding took place on June 27 and 28, 2022. Christopher J. Muzzi and Alison A. Ito represented the Debtors, and Michelle J. Chapman, Mark G. Valencia, and Maria Amparo V. McCormick represented TDH.

Based on the following findings of fact and conclusions of law, I will

enter judgment in favor of the Debtors.

I.    **Findings of Fact**

    **A. Du Sha's Companies**

An individual named Du Sha attempted to build an international network of golf courses and golf course residential communities. He formed, and is the ultimate owner of, a network of companies for this purpose.

The Debtors are among Du Sha's companies. They own parcels of land totaling 644 acres in Makaha Valley, Oahu, Hawaii. They acquired the properties between 2011 and 2015 for a total purchase price of approximately $35 million. Between 2016 and 2019, they spent about $15 million in attempting to develop the properties.

Some of the Debtors incurred debts to acquire their properties. MDRE 3 and MDRE 4 executed promissory notes (the "Towne Notes") in the original principal amounts of $5,000,000.00 and $3,780,000.00 that were secured by first mortgages on their properties.

One of the Debtors, PLUSH, is a holding company that is the member

3

of the other Debtors. PLUSH has no other significant assets and no source of income other than any surplus net income generated by the other Debtors.

MVCC operates the Makaha Valley Country Club and golf course on its parcels. The golf course has produced some income, but not enough to cover its ordinary operating expenses. (For example, in 2019, MVCC earned $1,095,744 of income but incurred expenses of $1,332,977, for a loss of $237,233.) A second golf course exists on MGCW's property, but that course has not been open for play since 2011 and does not generate any income. The land owned by the other Debtors is largely unimproved and does not generate any income. By 2019, the Debtors were suffering annual cash shortages of more than $5 million.

The Debtors covered their operating and development expenses by obtaining equity infusions from their affiliates (other members of Du Sha's network of companies).

Tianjin Kapolei Business Information Consultancy Co., Ltd. ("TKB") is another company owned by Du Sha. The Debtors are affiliates, but not

4

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 4 of 32

direct or indirect owners, of TKB.

## B. The TDH Loans

TKB borrowed RMB 240 million from TDH in 2017 and an additional
RMB 160 million in 2018. Initially, the Debtors were not liable for
repayment of either loan and did not pledge any of their properties as
security for the loan.

The Debtors did not directly receive any proceeds of the TDH loans.
The affiliates who did receive loan proceeds made equity contributions
(directly or indirectly) to the Debtors. The affiliates also received some cash
deposits for golf club memberships, and the record does not make clear
whether the affiliates used TDH loan proceeds or their other cash to infuse
money into the Debtors.

## C. The 2019 Transaction

In 2019, around the time that the TDH loans were set to mature, Du
Sha told TDH that TKB did not have enough cash to repay the loans. He
painted a rosy picture of his companies' prospects and requested an
extension.

TDH agreed to enter into a transaction (the "2019 Transaction") that was documented as a new loan. But the amount of the new loan was equal to the amount of the existing loan, and the documents required the borrowers to repay the old loan with the proceeds of the new loan. Thus, the 2019 Transaction was in substance only an extension of the maturity date of the old loans.

TDH was willing to grant the extension only if each of the Debtors, as well as Du Sha, his wife Du Ran, and one other affiliate, Pacific Links International Company, became obligated to repay the loans and the Debtors granted security interests in all of their real estate to secure the loans. This was an essential inducement for, and a precondition of, TDH's willingness to enter into the 2019 Transaction.

At the time of the 2019 Transaction, TDH knew, or at the very least should have known, that the Debtors were in financial distress and that the obligations the Debtors undertook and the transfers they made would make their financial difficulties substantially worse. TDH also knew, or at the very least should have known, that the Debtors had no realistic hope of

6

repaying the obligations they undertook in the 2019 Transaction without selling all of their assets.

To reflect the 2019 Transaction, the Debtors executed the following documents, dated December 11, 2019 (the "2019 Transaction Documents"):

1. Framework Agreement (Exhibit P-31);

2. Secured Guaranty (Exhibit P-29);

3. Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made be MVCC and filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii (the "Land Court") as Document No. T11048182 and noted on Certificate of Title No. 1040426 (Exhibit P-32);

4. Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made by MGCW and filed in the Land Court as Document No. T11070209 and noted on Certificate of Title 1073853 and 1073854 (Exhibit P-33);

5. Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made by MDRE and filed in the Land Court as

7

Document No. T11070208 and noted on Certificate of Title No. 11070208 (Exhibit P-34);

6. Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made by MDRE 2 and filed in the Land Court as Document No. T11049137 and noted on Certificate of Title No. 1098168 (Exhibit P-35);

7. Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made by MDRE 4 and filed in the Land Court as Document No. T11046279 and noted on Certificate of Title No. 1100715 (Exhibit P-36);

8. Mortgage Assignment of Leases and Rents, Security Agreement, and Fixture Filing, made by MDRE 5 and filed in the Land Court as Document No. T11048283 and noted on Certificate of Title No. 1102363 (Exhibit P-37); and

9. Membership Interest Pledge Agreement, made by PLUSH (Exhibit P-38).

The titles of some of the 2019 Transaction Documents (such as the

"Secured Guaranty") give the impression that the Debtors are guarantors of the loan who would only have to pay if TKB, as the primary obligor, did not. But the operative provisions of the documents make clear that the Debtors are not mere guarantors. Rather, they are primarily and directly liable to TDH as co-obligors with all other obligated parties.

In short, under the 2019 Transaction, the Debtors became liable, for the first time, for a debt of RMB 400 million (equivalent at that time to approximately $57,000,000) and pledged all of their assets to secure that debt.

### D. Reasonably Equivalent Value

I have entered a partial summary judgment holding that the Debtors did not receive reasonably equivalent value in return for the obligations incurred and the transfers they made in connection with the 2019 Transaction. Nevertheless, TDH offered evidence at trial related to that issue and the Debtors did not object, so I will evaluate that issue in light of the evidence admitted at trial.

TDH did not make the 2017 and 2018 loans in exchange for the

obligations and transfers that the Debtors undertook in the 2019

Transaction Documents. At the time of the 2017 and 2018 loans, there was

no understanding that the Debtors would later become obligated on the

loans or provide security.

TDH contends that the Debtors received over $80 million of benefits

as a result of the 2019 Transaction. I find that this is not correct and that, to

the contrary, the Debtors received no benefit from the 2019 Transaction that

was anywhere close to equivalent to the value of what they gave up.

The Debtors received no loan proceeds from the 2019 Transaction

because there were no such loan proceeds. TDH did not advance any new

money to any party as part of that transaction.

Almost $74 million of the benefits that TDH contends the Debtors

received consists of the total projected sales of golf club memberships and

the total projected net proceeds of house lots within the Makaha

development. This is an unrealistic measure of any benefit to the Debtors

from the 2019 transaction because the extension TDH provided was to

expire in only a few years. At most, the 2019 Transaction gave the Debtors

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 10 of 32

a short-duration opportunity to attempt to complete the development and sale of the project and obtain additional equity infusions from affiliates. But both of those opportunities were illusory and worth far less than $57 million.

The Debtors had no reasonable expectation that they could sell enough house lots or memberships before the extended maturity of the loans to produce $74 million (or even $57 million, the amount of the debt that they undertook). Particularly as to the house lots, any such expectation would have been wildly unrealistic since the Debtors had not even finished the civil engineering planning work by December 2019, let alone completed the subdivision improvements that were necessary to sell lots. The Debtors' projections, on which TDH's expert relied, show that about two-thirds of the sales were expected to occur *after* the extended TDH loan became due. (And, as I find below, the Debtors' management probably did not believe those projections, because within days after the 2019 transaction, the Debtors began the process of ceasing all development work.)

11

TDH argues that the 2019 Transaction allowed the Debtors' affiliates to continue infusing cash into the Debtors. But the debtors had no reasonable expectation that their affiliates would contribute anything close to $57 million in cash during the one-year extension of the TDH loan. At the time of the 2019 Transaction, the Debtors' affiliates had already told the Debtors that the affiliates could not continue to provide as much cash as they had provided, and the affiliates had in fact begun to reduce the infusions. As it happened, the Debtors received only about $800,000 of equity infusions from their affiliates after the 2019 Transaction. (TDH's expert testified that the 2019 Transaction permitted the Debtors to receive more than $7 million of additional paid in capital, but I find that his opinion is unreliable because it is based on incorrect inferences drawn from the Debtors' 2020 federal income tax return.)

Therefore, I find that the Debtors did not receive reasonably equivalent value in exchange for the obligations and transfers they undertook in the 2019 Transaction.

### E.  The Debtors' Financial Condition in December 2019

12

Around the time of the 2019 Transaction, the Debtors decided to abandon the effort to develop their properties. By the fall of 2019, the Debtors were collectively incurring large cash shortfalls each month, even after deferring development expenses,[1] and the affiliates lacked enough cash to cover those losses. On October 15, 2019, the Debtors hired an agent to offer their properties for sale at an aggregate list price of $35 million. This was approximately equal to the Debtors' aggregate purchase price for the properties and the tax assessed value of the property at the time.

TDH emphasizes that, when the Debtors entered into the 2019 Transaction, Du Sha presented to TDH an optimistic vision of his companies' prospects. That version was not realistic and not even the Debtor's management shared it. On December 12, 2019, one day after the Debtors entered into the 2019 Transaction Documents, Du Sha wrote to the

_____

[1] The deferred expenses mostly related to the civil engineering design work needed to create individual house lots for sale and to rebuild the golf courses. The deferral of these expenses did not solve the Debtors' problems, because that work had to be completed eventually in order to carry out the Debtors' business plan. Rather, the deferral only delayed the inevitable failure of the Debtors' business.

13

Debtors' management and laid out his ideas for obtaining equity investments to fund the development project. Only three days later, on December 15, 2019, the Debtors' chief executive officer told Mr. Sha that his ideas would not work and that the Debtors instead needed to stop work on the project, consider closing the operating golf course, and redesign and downscale the entire project. Although these communications occurred after the 2019 Transaction Documents were signed, the testimony made clear that the Debtor's CEO and executives (other than Du Sha) were just as pessimistic on and before December 11, when the Debtors signed the 2019 Transaction Documents, as they were on December 15.

By January 9, 2020, the Debtors acted in accordance with the chief executive officer's advice and stopped all work, thus ending the Debtors' effort to develop the Makaha properties.

## 1. Unreasonably Small Capital

Before the 2019 Transaction, the Debtors had a very small chance of obtaining sufficient cash (from their operations, equity infusions from affiliates, potential sales, and possible loans) for the business in which they

14

were engaged.

Only one of the Debtors – MVCC – generated any operating income, and that income was insufficient to cover its own operating expenses, let alone the operating expenses of the other Debtors or any development expenses.

The Debtors' affiliates were the only realistic sources of equity infusions. The infusions had begun to decline before the 2019 Transaction and they dried up completely soon thereafter.

The Debtors could not sell properties (other than in a bulk, liquidation sale) because they lacked sufficient funds to develop their properties into saleable lots and revenues from golf membership sales had ended. The Debtors had no realistic hope of selling property or memberships in time to meet their obligations.

Before the 2019 Transaction, the Debtors' assets were worth substantially more than their debts. The Debtors might have been able to obtain loans based on this equity. But the chance of obtaining loans was very small because the Debtors had almost no cash flow with which to

service any new debt.

The 2019 Transaction added $57 million of secured debt to the Debtors' balance sheets. This eliminated most, if not all, of the Debtors' equity in those properties and extinguished any faint hope the Debtors might have had of obtaining new financing to fund their operational and development needs.

### 2. Inability to Pay Debts When Due

When the Debtors entered into the 2019 Transaction, each of them intended to incur and believed that they would incur debts that would be beyond their ability to pay as such debts became due. The Debtors knew that they would incur debts, such as real property taxes, and that they had insufficient cash to pay those debts when they became due. The Debtors also knew that installment payments to Towne would become due and that the Debtors lacked the money to make those payments.

### 3. Balance Sheet Insolvency

**Assets.** At the time of the 2019 Transaction, the Debtor's real estate was collectively worth not more than $35 million. I make this finding based

primarily on the evidence that, on or about October 15, 2019, the Debtors listed all or substantially all of their real estate for sale at an asking price of $35 million and the aggregate tax assessed value of the properties was $35,318,000. This value is an upper limit: in July 2022, the Debtors sold the real estate for $20.7 million, which suggests that the property was likely worth much less than $35 million only two and a half years earlier, in December 2019.

TDH points out that the book value of the real property was higher than this amount. But in this case book value is not a reliable indicator of fair value as of the time of the 2019 Transaction. Book value is based primarily on the price that the Debtors paid for the properties between 2011 and 2015 plus the amounts spent to develop the properties in the meantime. The evidence showed, however, that Du Sha's companies consistently overpaid for property, and there is no evidence that the Debtors' development expenditures increased the Makaha properties' value. The listing price, the tax assessed values, and the sale price in 2022 are more reliable indicators of value in this case.

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 17 of 32

The listing price for the properties does not indicate the value of each Debtor's individual properties. But because the listing price is approximately equal to the tax assessed value, I find it is reasonable to apportion the total value in accordance with the tax assessed values of each Debtors' properies. Therefore, I find that the values of the individual properties owned by each Debtor are not greater than their tax assessed values, as follows:

| | |
|---|---|
| Hawaii MVVC LLC | $9,141,100 |
| Hawaii MGCW LLC | $9,147,200 |
| MDRE LLC | $5,015,200 |
| MDRE 2 LLC | $4,525,900 |
| MDRE 3 LLC | $2,309,500 |
| MDRE 4 LLC | $5,179,200 |
| MDRE 5 LLC | $500 |

The financial statements of the Debtors also list, as assets, amounts owed to each Debtor by other members of Du Sha's network of companies. I find that the fair value of these intercompany accounts was zero at the time of the 2019 Transaction, because none of the companies was able to pay any of those accounts.

The other assets – largely cash in bank accounts – had no material

18

value.

**Liabilities**. Before the 2019 Transaction, the Debtors were probably solvent, meaning that the fair value of each Debtor's assets exceeded that Debtor's liabilities.

In order to determine whether the Debtors' assets were greater or less than their liabilities after the 2019 Transaction, one must decide how to treat the debt they incurred in the 2019 Transaction.

The Debtors' expert opined that the full amount of the $57 million debt to TDH should appear as a liability on each of their balance sheets. If this treatment were correct, the Debtors would be insolvent. And on the surface, this approach seems reasonable because each Debtor was jointly and severally liable for the entire debt. But this treatment is not realistic: TKB is not entitled to a multiple recovery, so there is no circumstance under which each of the Debtors would pay $57 million.

TDH argues that, because there are twelve obligors under the 2019 Transaction Documents, one-twelfth of the $57 million debt should be allocated to each of the Debtors and the other obligors. Under this

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 19 of 32

allocation, some of the Debtors would be insolvent, but the Debtors with the most valuable assets would not. This allocation ignores the fact, however, that the 2019 Transaction Documents make the obligors jointly and severally liable for the entire debt. None of the Debtors could pay one-twelfth of the debt and escape liability for the rest of it.

It is more realistic to allocate the liability in accordance with each obligors' net worth. This reflects the practical reality that the Debtors and the other obligors could never pay more than their respective net worth to TDH. If the aggregate net worth of all of the obligors were less than or equal to $57 million, each of the obligors would clearly be insolvent.

But to perform this calculation, one would have to know the net worth of the obligors other than the Debtors (TKB, Du Ran, Du Sha, and Pacific Links International Company). The record contains no evidence about the financial condition or net worth of the non-Debtor co-obligors.

Thus, the Debtors have not met their burden of establishing that they were insolvent after the 2019 Transaction.

### F.  Bankruptcy Filing and Events

On February 1, 2021, each of the Debtors filed a petition under chapter 11 of the Bankruptcy Code.

In June 2022, the court authorized the Debtors to sell their properties for $20.7 million. This was an arms-length sale that reflected the fair value of the properties at the time.

## II. Conclusions of Law

### A. 11 U.S.C. § 548(a)(1)(B)

Bankruptcy Code section 548 allows the debtor-in-possession[2] to avoid any transfer of an interest of the debtor or any obligation incurred by the debtor within two years of the petition if certain conditions exist. The specific subsection employed by the Debtors addresses "constructively" fraudulent transfers that are avoidable based largely on the objective circumstances and effects of the transfers, and without proof of actual intent to hinder, delay, or defraud creditors.

11 U.S.C. § 548(a)(1)(B) provides that a debtor in possession may

---

[2] Section 548 gives avoiding powers to the "trustee." As debtors in possession in their chapter 11 cases, the Debtors can assert the avoiding powers of a trustee. 11 U.S.C. § 1107(a).

21

avoid a transfer or obligation if the debtor received less than reasonably equivalent value in exchange for the transfer or obligation and one of four situations existed:

(I)    The debtor was insolvent on the date the transfer was made or obligation incurred or the debtor became insolvent as a result of the transfer or obligation;

(II)   The debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III)  The debtor intended to incur, or believed that the debtor would incur, debts that would be beyond its ability to pay as such debts matured; or

(IV)   The debtor made the transfer or incurred the obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

The financial condition of the transferor must be determined at the time at which the transfer occurred or the obligation was incurred.[3]

B. **Section 544(b) and Hawaii Uniform Fraudulent Transfers Act ("HUFTA")**

Section 544(b) of the Bankruptcy Code provides that, subject to an exception that is not applicable here, "the trustee may avoid any transfer of

_____

[3] *See In re U.S. Invs. Co. of Am.*, 4 F. App'x 541, 542 (9th Cir. 2001).

an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an [allowable] unsecured claim . . ." Section 544(b) allows the trustee to step into the shoes of an actual creditor of the debtor and assert avoidance claims that the creditor could bring.

The Debtors employ section 544(b) to assert claims under the Hawaii Uniform Fraudulent Transfers Act (Haw. Rev. Stat. ch 651C, "HUFTA"). In particular, the debtors allege that these obligations and transfers are constructively fraudulent under Haw. Rev. Stat. § 651C-4(a)(2):

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation:
> . . .
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>    (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>    (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[4]

---

[4] The Debtors' Complaint did not cite section 651C-5, the state law corollary to 11 U.S.C. § 548(a)(1)(B)(ii)(I).

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed   08/08/22   Page 23 of 32

If a transfer is fraudulent under this section, Haw. Rev. Stat. § 651C-7 allows a qualifying creditor to avoid the transfer. Section 544(b) in turn permits the debtor in possession to assert those avoidance claims.

There is no dispute that the Debtors are entitled to assert claims under HUFTA and that a qualifying creditor exists.

### C. "Transfer" and "Obligation" Defined

The statutes define "transfer" broadly. The word means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease, and the creation of a lien or encumbrance."[5]

Neither HUFTA nor the Code defines "obligation." Applying its ordinary meaning, the term includes a debt.

There is no dispute that the debts that the Debtors incurred in the 2019 Transaction are "obligations" and the mortgages and security interests they granted were "transfers" within these definitions.

---

[5] Haw. Rev. Stat. § 651C-1; *see also* 11 U.S.C. § 101(54).

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed 08/08/22   Page 24 of 32

## D. Burden and Standards of Proof

The Debtors bear the burden of proof on all issues. Although intentional fraudulent claims require the proponent to meet the "clear and convincing evidence" standard, the "preponderance of the evidence" standard applies to constructively fraudulent transfers.[6] Each Debtor must individually carry its own burden of proof.

## E. Reasonably Equivalent Value

In order to avoid an obligation or transfer as constructively fraudulent, each Debtor must prove that it did not receive reasonably equivalent value in exchange for the obligation or transfer.[7] "An examination into reasonably equivalent value is comprised of three inquiries: (1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received."[8]

---

[6] *See Kekona v. Abastillas*, 113 Hawaii 174, 181 (2006); *see also, e.g., In re Garcia*, 465 B.R. 181, 191 (Bankr. D. Id. 2011); *In re Dreier LLP*, 452 B.R. 391, 436 (Bankr. S.D.N.Y. 2011).

[7] *See* 11 U.S.C. § 548(a)(1)(B)(i); H.R.S. § 651C-4(a)(2).

[8] *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 463 (B.A.P. 9th Cir. 2013)

Bankruptcy Code section 548(d)(2)(A) provides that "value means property, or satisfaction or securing of a present or antecedent debt of the debtor," with an exclusion that does not apply here. Haw. Rev. Stat. § 651C-3 is the same in substance.

Value can be provided either directly or indirectly.[9] If the value is indirect, however, the burden shifts: after the plaintiff makes a prima facie case for avoidance, the defendant has the burden to demonstrate the existence of an indirect benefit.[10]

I have found, both on partial summary judgment and the evidence admitted at trial, that none of the Debtors received reasonably equivalent value in exchange for the obligations and transfers they undertook in the

---

(citing *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 341-43 (Bankr. N.D. Cal. 2009)).

[9] *See, e.g., Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004).

[10] *See Henshaw v. Field (In re Henshaw)*, 485 B.R. 412, 422 (D. Haw. 2013) (quoting *In re Trigem Am. Corp.*, 431 B.R. 855, 868 (Bankr. C.D. Cal 2010), for the proposition that once a bankruptcy trustee "makes a prima facie showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient indirect benefic that is tangible and concrete.").

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 26 of 32

2019 Transaction.

**F. Insolvency**

Section 548(a)(1)(B)(ii) provides that a debtor in possession may avoid a transfer or obligation if (among other criteria) the debtor was insolvent when it made the transfer or incurred the obligation or became insolvent as a result of the transfer.

An entity that is not a partnership or municipality is "insolvent" if the sum of its debts is greater than all of its property, at a fair valuation.[11]

I have found that, applying this "balance sheet" definition, the Debtors were solvent before the 2019 Transaction. But the record does not permit me to determine the correct amount of each Debtors' debts after the 2019 Transaction. Therefore, the Debtors have not carried their burden of proof on the issue of insolvency.

**G. Unreasonably Small Capital**

The Debtors can prevail if they establish that they were engaged in a business or were about to engage in a business for which their remaining

---

[11] *See* 11 U.S.C. § 101(31).

27

property was an unreasonably small capital.[12]

This test, also known as the "adequate capital" test, denotes a financial condition short of equitable or "cash flow" insolvency.[13] This test is "aimed at transferees that leave the transferor technically solvent but doomed to fail."[14]

In determining unreasonably small capital, courts generally examine cash flow to determine whether it was "reasonably foreseeable" that the transfer at issue would lead to the debtor's "inability to generate enough cash flow to sustain operations."[15] In a business setting, the aggregate amount of capital "should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from

---

[12] *See* 11 U.S.C. § 548(a)(1)(B)(ii)(II); Haw. Rev. Stat. § 651C-4(a)(2)(A).

[13] *Moody v. Security Pacific Business, Credit, Inc.*, 971 F.2d 1056, 1070 (3rd Cir. 1992); *AWRE Liquidation Tr. v. 2100 Grand LLC (In re AWTR Liquidation Inc.)*, 548 B.R. 300, 312-13 (Bankr. C.D. Cal. 2016); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991) (unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency but are likely to lead to some type of insolvency eventually).

[14] *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

[15] *Moody*, 971 F.2d at 1070.

28

operations, or cash from secured or unsecured loans over the relevant time period."[16]

Some courts hold that it is necessary to examine not only "the ability of the debtor to generate enough cash from operations and sales of asserts to pay its debts and remain financially stable" but also whether "the disputed transfers *cause* the unreasonably small capital condition."[17] Where a debtor already has unreasonably small capital, that the debtor subsequently engaged in transfers which worsened, but did not cause, its financial infirmities, will not subject those transfers to avoidance as fraudulent transfers.[18]

I have found that, before the 2019 Transaction, the debtors had only a small chance of obtaining enough capital to fund their operations, and that the 2019 Transaction eliminated that small chance. Therefore, the "unreasonably small capital" criterion is met.

### H. Inability to Pay Debts When Due

---

[16] *Id.* at 1072 n.24.
[17] *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992).
[18] *See id.*

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 29 of 32

Alternatively, the Debtors may satisfy the "cash flow" or "equitable insolvency" test, under which they must demonstrate that at the time of the transfers, they intended to incur or believed that they would incur debts beyond their ability to pay as they became due.[19] "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."[20]

I have found that, when they entered into the 2019 Transaction, the Debtors intended to incur, and believed they would incur, debts that they could not pay when due.

## I. Good Faith Defense

Even when a transfer is fraudulent under section 548(a) or (b), subsection (c) provides that a transferee or obligee who takes for value and

---

[19] *See* 11 U.S.C. § 548(a)(1)(B)(ii)(III); Haw. Rev. Stat. § 651C-4(a)(2)(B).
[20] 5 COLLIER ON BANKRUPTCY at ¶ 548.05[3][c] (citing cases).

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 30 of 32

in good faith has a lien on or may retain any interest transferred to the extent of the value given.[21] HUFTA has a similar provision.[22] Under this defense, "even if a transferee gave reasonably equivalent value in exchange for the transfer avoided . . . the transferee may not recover such value if the exchange was not in good faith because good faith is 'indispensable' for the transferee who would recover any value."[23]

Good faith is not susceptible to a precise definition, but courts generally apply an objective standard and consider what the transferee "knew or should have known" rather than what the transferee actually knew from a subjective standpoint.[24] The burden of proof for the good faith defense is on the transferee.[25]

---

[21] *See* 11 U.S.C. § 548(c).

[22] Haw. Rev. Stat. § 651C-8(d).

[23] *In re Agricultural Research and Technology Group, Inc.* 916 F.2d 528, 535 (9th Cir. 1990).

[24] *Id.* at 536; *see In re Bernard L. Madoff Investment Securities LLC*, 12 F.4th 171, 189 (2nd Cir. 2021) (quoting *In re Nieves*, 648 F.3d 232 (4th Cir. 2011)) ("a transferee does not act in good faith when he has sufficient [actual] knowledge to place him on inquiry notice of the debtor's possible insolvency").

[25] *In re Agricultural Research*, 916 F.2d at 535.

U.S. Bankruptcy Court - Hawaii   #21-90009   Dkt # 196   Filed  08/08/22   Page 31 of 32

TDH has argued that it entirely relied upon the statements made by Du Sha regarding the companies' upcoming success and their current financial condition. They also maintain that the 2019 Transaction provided over $80 million in value.

TDH's focus on its subjective knowledge during the 2019 Transaction is misplaced. I have found that TDH knew or should have known that the Debtors were in financial distress and the 2019 Transaction would make their financial condition much worse. Therefore, TDH has not met its burden to establish the good faith defense.

**III. Judgment**

Based on these findings of fact and conclusions of law, I will enter judgment in favor of the Debtors and against TDH avoiding the obligations and transfers that took place under the 2019 Transaction Documents. Counsel for the Debtors shall prepare a proposed separate judgment.

**END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**